**In re John E. and Antonieta V. FULLER, Debtors.**

**No. 06–30313.**

United States Bankruptcy Court, S.D. Illinois.

June 21, 2006.

Stan R. Weller, Dixon and Johnston, Belleville, IL, for Debtors.

## ORDER DENYING TRUSTEE'S OBJECTION TO CONFIRMATION AND SETTING THE MATTER OVER FOR FURTHER HEARING

PAMELA PEPPER, Bankruptcy Judge.

The trustee has objected to confirmation of the debtors' Chapter 13 plan, arguing that the plan does not commit all of the debtors' disposable income to the plan as required by 11 U.S.C. § 1325(b)(1)(B). The debtors filed their petition after October 17, 2005, the effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). Thus the trustee's objection calls upon the Court to review and interpret § 1325 and related provisions under the new law.

The specific issue the objection raises is the question of how one goes about determining a Chapter 13 debtor's "projected disposable income" under § 1325(b)(1)(B) of BAPCPA. Before BAPCPA, this was a relatively simple exercise—take the income the debtor listed on her Schedule I, subtract from it the expenses the debtor listed on her Schedule J, and consider whatever was left over to be projected disposable income. BAPCPA appears to have changed that analysis. Just how BAPCPA has changed the analysis is the question with which debtors, trustees and courts now grapple. This Court concludes

that parties must use rely on both Form B22C—a new form—and Schedule I to determine a debtor's "projected disposable income" for the purposes of § 1325(b)(1)(B).

### Factual Background

On March 10, 2006, the debtors filed their Chapter 13 petition. Their Schedule I states that at the time of the filing of the petition, they had a combined monthly income of $6,948.00. Schedule J indicates that their monthly expenses as of the date the petition was filed were $6,220.00. Subtracting the expenses from the income, one finds that the debtors showed a monthly net income of $728.00 at the time they filed their petition.

The debtors also filed a document called Form B22C. This is a new form, one of many created to address new requirements imposed by BAPCPA. This form is entitled, "Statement of Current Monthly Income and Calculation of Commitment Period and Disposable Income." This form, like Schedule I, shows the debtors' income. However, Form B22C instructs debtors that

> [a]ll figures must reflect *average monthly income for the six calendar months prior to filing the bankruptcy case,* ending on the last day of the month before the filing. If you received different amounts of income during these six months, you must total the amounts received during the six months, divide this total by six, and enter the result on the appropriate line.

Thus, while Schedule I is a snapshot of the debtors' income on the day they prepared the schedule (presumably shortly before they file the petition), Form B22C is a look back at historical income information from the six months *before* the debtors filed for bankruptcy protection.

On the Form B22C, the debtors show their income for the six months prior to March to be $9,395.00—some $2,400 more than the income shown on their Schedule I. In working through the Form B22C calculations, the debtors determined that their income (that average of the six months prior to the date they filed the petition) was higher than the median income for a household of the same size in Illinois, their state of residence. Eventually they worked their way down to line 58 of the form, "Monthly Disposable Income Under § 1325(b)(2)." The number on this line came out to $649.23.

The plan the debtors seek to have the Court confirm proposes to pay a total minimum amount of $1,000 to the unsecured creditor pool. In his objection, the trustee argues that if one takes $649.23 a month (the amount Form B22C indicates the debtors have left over as "disposable income") and multiplies that times 60 (the length of the plan's commitment period in months), one comes up with a total of $38,953.00 to pay the unsecured pool, not the $1,000 proposed in the debtors' plan.

The Court held a hearing on the trustee's objection on May 11, 2006. At the hearing, the debtors argued that if they were required to commit $649.23 per month to the plan to pay the unsecured pool, their plan would no longer be feasible and thus would fail. They argued that, rather than using the income from the six months *before* they filed their plan to determine how much disposable income they could commit to the plan, the trustee should look forward—presumably by looking at Schedules I and J—to determine how much disposable income the debtors were likely to have in the future.

When the Court enquired of the debtors at the hearing on May 11 as to whether there was any support for their position in the statute itself, the debtors were uncer-

tain. The trustee, however—attempting to fairly lay out all sides of the argument—pointed out that support for the debtor's position could be found in the language of § 1325(b) itself. Section 1325(b)(1)(B) clearly states that all of the debtors *projected* disposable income must be committed to the plan. The word *projected* appears to refer to a look forward into what the debtors' disposable income may be in the future, not a look *back* at the six months prior to the filing of the petition. The Court, wishing to devote attention to this issue, took the matter under advisement.

### BAPCPA Definitions

Section 1325(b)(1) of the Bankruptcy Code—a provision that changed little with the BAPCPA amendments—mandates that if a trustee or an unsecured creditor objects to the confirmation of a Chapter 13 plan, the court cannot approve that plan unless, as of the effective date of the plan,

(A) the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or

(B) *the plan provides that all of the debtor's projected disposable income to be received in the applicable commitment period beginning on the date that the first payment is due under the plan will be applied to make payments under the plan.*

11 U.S.C. § 1325(b)(1) (emphasis added).

*"Disposable Income"*

Section 1325(b)(2) is a definitional section, and unlike § 1325(b)(1), it did change considerably with the BAPCPA. Section 1325(b)(2) now defines the term "disposable income." Relevant to the issue raised in this case is the fact that § 1325(b)(2) does *not* define the term actually used in § 1325(b)(1)—it does *not* define *"projected*

disposable income." It defines only "disposable income," and defines it as follows:

current monthly income received by the debtor (other than child support payments, foster care payments, or disability payments for a dependent child made in accordance with applicable nonbankruptcy law to the extent reasonably necessary to be expended for such child) less amounts reasonably necessary to be expended—

(A)(i) for the maintenance or support of the debtor or a dependent of the debtor, or for a domestic support obligation, that first becomes payable after the date the petition is filed; and

(ii) for charitable contributions (that meet the definition of 'charitable contribution' under section 548(d)(3) to a qualified religious or charitable entity or organization (as defined in section 548(d)(4)) in an amount not to exceed 15 percent of gross income of the debtor for the year in which the contributions were made; and

(B) if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business.

*"Current Monthly Income"*

This definition, in and of itself, requires parsing in order to understand and apply it. The first three words—"current monthly income"—are one of BAPCPA's new contributions to the bankruptcy lexicon. Congress defined "current monthly income" in § 101(10A) of the statute. "Current monthly income" is "the average monthly income from all sources that the debtor receives ... without regard to whether such income is taxable income, derived during the 6–month period ending on ... the last calendar month immediately preceding the date of the commencement of the case...." Section 101(10A)

goes on to indicate that "current monthly income" does *not* include benefits received under the Social Security Act, payments to victims of war crimes, or payments to victims of terrorism.

SO—to determine "disposable income" under § 1325(b)(2), one must:

* take the average of all sources of monthly income for the six months preceding the month in which the petition is filed;
* subtract child support payments, foster care payments, disability payments for dependent children "to the extent reasonably necessary to be expended" for the child;
* subtract "amounts reasonably necessary to be expended" for maintenance or support of the debtor or the debtor's dependents;
* subtract domestic support obligations that "first become[ ] payable after the date the petition is filed";
* subtract applicable charitable contributions that do not exceed 15% of the debtor's gross income for the year the contributions were made; and
* if the debtor "is engaged in business," subtract the expenditures necessary to continue, preserve and operate the business.

*"Amounts Reasonably Necessary to be Expended"*

Mind-boggling though it may seem, this does not end the analysis. Section 1325(b)(3) further expands on the "amounts reasonably necessary to be expended" language from § 1325(b)(2)—but only for those debtors whose household incomes are higher than the median incomes of similarly-sized households in their state of residence. In those cases—cases where the debtor's household income is above the median—the "amounts rea-

sonably necessary to be expended" (in other words, the amounts the debtor can deduct from the "current monthly income" for disposable income purposes) must be calculated by looking at § 707(b)(2)(A) and (B).

Section 707(b) is the portion of the bankruptcy code which allows a court to dismiss or convert an individual debtor's Chapter 7 bankruptcy if (1) that debtor has primarily consumer debt and (2) the court finds that granting the bankruptcy relief the debtor requests would constitute "an abuse of the provisions" of Chapter 7. Sections 707(b)(2)(A) and (B) instruct courts on how to determine whether the debtor's Chapter 7 petition constitutes "an abuse" by setting up what has come to be known as a "means test." The means test dictates that if the debtor's "current monthly income" (again as defined in § 101(10A)), reduced by certain specified amounts and multiplied by 60, is not less than either 25% of the debtor's nonpriority unsecured claims or $6,000 (whichever is higher), OR $10,000, the court "shall presume" that abuse exists.

The specified amounts that the debtor is allowed to use to reduce the "current monthly income" for § 707(b) purposes are expenses. These expenses are specifically laid out in the statute. They include the debtor's applicable expenses as specified under the National Standards and Local Standards and the debtor's actual expenses as specified in Other Necessary Expenses issued by the IRS for the debtor's residence area. They include "reasonably necessary" expenses for health insurance, disability insurance and health savings accounts, expenses to protect the debtor and the debtor's family from family violence, additional necessary amounts for food and clothing, expenses to care for elderly, ill or disabled family members, administrative expenses for Chapter 13

debtors, documented expenses for children to attend private or public elementary or secondary schools, additional documented expenses for home energy costs, payments due secured creditors and expenses for payment of priority claims.

### Practical Application—Form B22C

This tangle of definitions explains why Form B22C—the form the Judicial Conference Committee has promulgated to help determine disposable income—is some six, tightly-packed pages long. On Part I, the debtor reports all of her income from the six months prior to the filing of the petition—wages, business or farm revenue, rental or real property revenue, interest, pension and retirement income, contributions from outside parties, unemployment compensation, and miscellaneous income. On Part II, the debtor compares her income from Part I with the median income for similarly-sized households in her state of residence. If her income is below the median, her "commitment period" under § 1325 is three years; if her income is above the median, her "commitment period" is five years.

On Part III, the debtor again compares her income from Part I with the median income of a similarly-sized household in her state, this time to figure out whether she should subtract the Schedule J expenses or use the § 707(b) expenses. If her income is lower than the median, she calculates her expenses by subtracting from her current monthly income the expenses specified in § 1325(b)(2)—in other words, her Schedule J expenses. If her income is higher than the median, she

must calculate her expenses as directed by § 707(b).

Those debtors whose income is higher than the median move on to Part IV, the part of the form that walks them through the § 707(b)(2) expense calculations. At the end of this exercise, the debtor comes up with a total dollar amount for allowable expenses, shown at line 52 of Form B22C.

Finally, the debtor comes to Part V, "Determination of Disposable Income Under § 1325(b)(2)." On Part V, the debtor takes the original "current monthly income" number from Part I, subtracts all of the allowable expenses and deductions, and finds on line 58 a number which, according to the form, is the "monthly disposable income under § 1325(b)(2)."

It is this amount that the trustee argues a debtor's plan must commit to the unsecured pool in order to pass the "all of the debtor's projected disposable income" test in § 1325(b)(1)(B). The problem, of course, is that § 1325(b)(1)(B) does not require a debtor to commit all of his "disposable income" to the plan. It requires— as the trustee pointed out at the hearing— the debtor to commit all of his *projected* disposable income" to the plan. And, as indicated above, § 1325 does not define *projected* disposable income;" courts must determine what "projected disposable income" means.

### Case Law Analyzing the Issue

To date, four bankruptcy courts in other jurisdictions have opined on the specific meaning of "projected disposable income" in the BAPCPA regime. While all of them conclude that the term "projected disposable income" means something more than the number on line 58 of Form B22C,[1] two

---

1. One court has concluded that, for an above-median income debtor, "the debtor's ability to pay and whether the proposed plan commits all of the debtor's disposable income must be determined under section 1325(b) rather than as an element of good faith under section

1325(a)(3)." *In re Barr*, 341 B.R. 181, 186 (Bankr.M.D.N.C.2006). This decision does not focus on the definition of "projected disposable income," but rather on whether the new disposable income definition in BAPCPA

of the decisions define "projected disposable income" without reference to whether the debtor has an income above or below the median. The other two couch their definition in terms of whether the debtor's income falls above or below the median. This Court concludes that the distinction, in terms of the practical determination of a debtor's "projected disposable income," is not relevant.

*Hardacre*

On March 6, 2006, the bankruptcy court for the Northern District of Texas considered the issue. In *In re Hardacre,* 338 B.R. 718 (Bankr.N.D.Tex.2006), the debtor proposed a Chapter 13 plan that would provide no return to unsecured creditors. The trustee—like the trustee in the case at bar—objected to confirmation of the debtor's plan, arguing that the plan failed to commit all of the amount from the debtor's Form B22C. The *Hardacre* court described the problem raised by the "projected disposable income" language.

> Section 1325(b)(1)(B)'s use of the phrase "projected disposable income" raises the question of whether the calculation of disposable income for plan purposes should be based upon the debtor's average income for the six months prior to the bankruptcy, or the debtors projected income based upon her financial circumstances on the "effective date of the plan." In many cases, the answer will yield no difference; the debtor's projected income will be the same as her "current monthly income." However, a strict application of section 101(10A)'s definition of "current monthly income" can have serious consequences in some cases. For example, if "currently monthly income" as defined in section 101(10A) applies, a debtor who anticipates a significant enhancement of future income is provided strong incentive

to file a Chapter 13 as soon as possible. The amount of money that she would be required to commit to the plan would be based upon her lower average income prior to filing. On the other hand, a debtor who finds herself in the unfortunate circumstance of having a lower income after filing her petition might find that she is unable to confirm a plan because she cannot devote to the plan a "projected disposable income" predicated upon her prepetition income.

*Id.* at 722.

In light of this problem, the *Hardacre* court concluded that § 1325(b)(1)(B)'s use of the phrase "projected disposable income" referred to "the debtor's *anticipated* income during the term of the plan, not merely an average of her *prepetition* income." *Id.* (Emphasis added.) The court based this conclusion on several different grounds. First, it noted that Congress could have used the phrase "disposable income" in § 1325(b)(1)(B), rather than the phrase "projected disposable income." It did not. Accordingly, the *Hardacre* court concluded, Congress must have meant "projected disposable income" to mean something different than "disposable income." *Id.*

Second, the court observed that § 1325(b)(1)(B) referred to the projected disposable income "*to be received* in the applicable commitment period." (Emphasis added.) It concluded that if Congress truly had meant for projected disposable income to mean income received pre-petition, it would not have used the forward-looking language "to be received."

Finally, the court pointed out that § 1325(b)(1)(B) asks courts to look at whether the debtor is committing all projected disposable income "as of the effec-

supplants the "good faith" confirmation requirement in § 1325(a)(3).

tive date of the plan." Again, this language indicates that courts should look at the debtor's income as of the effective date of the plan, not the debtor's income prior to the filing of the petition.

For all of these reasons, the *Hardacre* court determined that "projected disposable income" meant income that the debtor would receive during the life of the plan. The court cautioned, however, that its conclusion did not mean that courts should ignore the CMI calculations. It stated, "Section 101(10A) continues to apply inasmuch as it describes the sources of revenue that constitute income, as well as those that do not."

## Jass

Some two weeks later, the bankruptcy court for the District of Utah confronted the same issue in *In re Jass*, 340 B.R. 411 (Bankr.D.Utah 2006). In *Jass*, the debtors argued that "the changes under the BAPCPA [did] not require them to pay unsecured creditors the amount resulting from their Form B22C, so long as they [could] show that the income and expenses reported on the Form [were] inadequate representations of their future budget." *Id.* at p. 414. This argument is similar to the argument made by the debtors in the current matter.

The *Jass* court reached the following conclusion:

> The Court believes that the language of § 1325(b)(1)(B) is clear and unambiguous—section 1325(b)(1)(B)'s requirement that a plan propose to pay "projected disposable income" means that the number resulting from Form B22C

is a starting point for the Court's inquiry only. Section 1325(b)(2) defines "disposable income" but § 1325(b)(1)(B) requires that a debtor propose a plan paying "*projected* disposable income." (Emphasis added). The Court must give meaning to the word "projected," as it obviously has independent significance. The word "projected" means "to calculate, estimate, or predict (something in the future), based on present data or trends." Thus, the word "projected" is future-oriented. By definition under § 1325(b)(2), the term "disposable income" is oriented in historical numbers. By placing the word "projected" next to "disposable income" in § 1325(b)(1)(B), Congress modified the import of "disposable income." The significance of the word "projected" is that it requires the Court to consider both future and historical finances of a debtor in determining compliance with § 1325(b)(1)(B).

\* \* \* \* \* \* \* \* \* \* \* \* \*

> Thus, the Court concludes that the plain meaning of § 1325(b) is dispositive of this issue. Under the clear meaning of the statute, a debtor must propose to pay unsecured creditors the number resulting from Form B22C, unless the debtor can show that this number does not adequately represent the debtor's budget projected into the future.

*Id.* at pp. 415–16 (notes omitted).[2]

### Kibbe

On April 14, 2006, the bankruptcy court for the District of New Hampshire decided *In re Kibbe*, 342 B.R. 411 (Bankr.D.N.H.

---

**2.** One other court has approved the forward-looking definition of "projected disposable income" in another context. In *In re Pak,* 343 B.R. 239 (N.D.Cal.2006), the California bankruptcy court agreed with the *Jass* reasoning "that the actual and anticipated future income must be considered, rather than simply

[the debtor's] 'current monthly income,' in determining the debtor's 'projected disposable income' for purposes of confirming a chapter 13 plan." Accordingly, the *Pak* court used that same income figure to decide whether to grant or deny a § 707(b)(3)(B) motion to dismiss. *Id.* at 245–46.

2006). The *Kibbe* court was the first to imply that the issue of whether a debtor was above or below the median income was relevant to the definition of the term "projected disposable income." In *Kibbe,* the debtor's "disposable income" from Form B22C was significantly lower than her monthly income at the time of filing as reflected on her Schedule I. *Id.* at 412–13. The debtor argued that her "disposable income" should be determined by looking at the amount on Form B22C, and that under that method, she had no money to pay to unsecured creditors. *Id.* at 413–14. The *Kibbe* court disagreed, and cited language from both *Jass* and *Hardacre* in reaching the conclusion that "projected disposable income," as that term is used in § 1325(b)(1)(B), "must be based upon the debtor's anticipated income during the term of the plan, not merely an average of her prepetition income." *Id.* at 413–14, quoting *In re Hardacre* at 722.

The *Kibbe* court, however, phrased the issue before it in the following way:

> The issue presented in this Chapter 13 case ... is whether a *below median* debtor's 'projected disposable income,' as that term is used in section 1325(b)(1)(B) is determined from Form B22C or whether 'projected disposable income' is determined by reference to Schedules I and J, when the debtor's 'current monthly income,' as defined by section 101(10A), is significantly lower than the debtor's actual current income.

*Id.* at 412–13 (emphasis added). The way the court phrased the issue implies that the definition of "projected disposable income" is based in some way on whether the debtor's income is below or above the median income of similarly-sized households in the debtor's state.

In the discussion portion of the *Kibbe* decision, the court notes that the debtor's case "is a below median case." The court said, "This yields two results: the Debtor's commitment period, i.e., length of plan, is three years; and section 1325(b)(3) is *not* used to determine the Debtor's disposable income." *Id.* at 412–13. Both of these facts are true, as discussed in the "BAPC-PA Definitions" analysis above.

Further on, the court states that "Section 1325(b)(2) defines 'disposable income' as current monthly income less expenses." *Id.* at 413–14. Accordingly, the court took the "current monthly income" from the debtor's Form B22C and subtracted the debtor's expenses from Schedule J to obtain a "disposable income" figure—a figure which was much lower than the figure resulting from subtracting the debtor's Schedule J expenses from her Schedule I income. *Id.* at 413–14. The court dropped a footnote at this point, which reads: "Again, if this were an above median case, the Debtor's expenses would be calculated pursuant to section 1325(b)(3). This being a below median case, though, the Court can only conclude that the Debtor's expenses are to be calculated by reference to Schedule J, as was the practice prior to BAPCPA." *Id.* at 413–14 n. 5. Accordingly, the *Kibbe* court found that "[i]n a below median case, 'projected disposable income,' as used in section 1325(b)(1)(B), is based on a debtor's current income and expenses as reflected in Schedules I and J." *Id.* at 413–15.

*Kibbe* leaves the impression that its definition of "projected disposable income" would have been different had the debtor in that case had income above the median for her state. But this begs the question—why? Why does the definition of "projected disposable income" relate to whether the debtor's "current monthly income" as defined in § 101(10A) is above or below the median income for similarly-sized households in the debtor's state? The most recent case on this issue, *In re*

*McGuire,* 342 B.R. 608 (Bankr.W.D.Mo. 2006), goes further, but does not answer this question.

*McGuire*

In *McGuire,* the trustee objected to confirmation of the debtors' plan because it ran less than the 60–month commitment period, and because the debtors allegedly claimed an improper expense which falsely lowered their Form B22C disposable income, resulting in their not committing all of their disposable income to the plan. *Id.* at 609–10. Unlike the debtor in *Kibbe,* however, the debtors in *McGuire* had a combined current monthly income that was *higher* than the median in their state. *Id.* at 610–11.

The *McGuire* court began by discussing how the calculation of "disposable income" for below-median debtors differs from the calculation of "disposable income" for above-median debtors. For below-median debtors, the court said, one takes the " 'current monthly income received by the debtor ... less amounts reasonably necessary to be expended' for the maintenance or support of the debtor or a dependent of the debtor, for a domestic support obligation, for certain charitable contributions and, if applicable, for expenditures necessary for the operation of the debtor's business." *Id.* at 610–11. The *McGuire* court took this language, with some omissions, straight from § 1325(b)(2). The court concluded that, for below-median debtors,

the income side of the equation is now calculated as a historical average rather than being based on actual numbers, but the determination of what constitutes reasonably necessary expenses for purposes of determining 'projected disposable income' to be paid into the plan is the same post-BAPCPA as it was pre-BAPCPA: it is based on the actual expenses identified in Schedule J and is

subject to the court's discretion as to the reasonableness of the claimed expenses. *Id.* at 610–11.

In contrast, the court noted that, for above-median debtors, one takes the "currently monthly income" minus the expenses that are allowed under § 707(b)(2)(A) and (B). *Id.* at 610–12. For above-median debtors, then,

the statute breaks down allowable expenses into five general categories: (1) those that fit into the IRS' National Standards, which include food, clothing, household supplies, personal care, and miscellaneous expenses; (2) those that fit into the IRS' Local Standards, which include housing and transportation; (3) actual expenses for items categorized by the IRS as "Other Necessary Expenses," including such items as taxes, mandatory payroll deductions, health care, and telecommunication services; (4) actual expenses, with limitations, for certain other expenses specified by the Bankruptcy Code, such as care for disabled family members and tuition; and (5) payments on secured and priority debts. Because § 707(b)(2)(A)(ii)(I) provides that monthly expenses pursuant to IRS Standards "shall not include any payments for debts," and debtors are permitted to deduct actual mortgage and car payment amounts separately, debtors must deduct from the IRS Standard expenses their monthly mortgage and car payments to avoid double-dipping.

*Id.* at 611–12.

From here, the *McGuire* court went on to discuss whether the debtors were allowed to claim the IRS vehicle ownership cost deduction if they owned their car free and clear, and it concluded that they could not deduct that expense. *Id.* at 612–15. In response to this conclusion, the debtors argued that forcing them to pay the en-

tire—now, in light of the court's ruling, higher—amount from Form B22C would not take into account their need in the future to purchase a new car, the payments for which would reduce the disposable income. The court disagreed, noting that this argument "presumes that a debtor's projected disposable income is fixed at the outset of the case, and that that number is not modifiable based on changes in the debtor's actual circumstances." *Id.* at 614–15.

The *McGuire* court pointed out that the words "projected disposable income" were in the Bankruptcy Code before the implementation of BAPCPA, and that BAPCPA did nothing to change those words. It pointed to an Eighth Circuit decision holding that "a debtor's projected disposable income changes from year to year, based on actual income and expenses," and opined that BAPCPA had not changed that holding. *Id.* at 614–15, citing *Rowley v. Yarnall,* 22 F.3d 190 (8th Cir.1994). In a footnote, the court pointed out that, in some circumstances, § 521(f) of BAPCPA requires the trustee or a party, to file annual income statements post-confirmation while the case is pending. The court observed that if debtors were not permitted, or even required, to change plan payments due to changes in their actual income and expenses, § 521(f) would have no purpose. *Id.* at 614 n. 22.

For all of these reasons, the *McGuire* court found that "the Form B22C disposable income calculation is merely a starting point, not a determinative number." *Id.* at 615. This brings to a total of four the number of courts agreeing that "projected disposable income"—at least with regard to above-median income debtors—does not mean the number on Form B22C, but involves review of Schedules I and J as well. It does not, however, fully answer the question of whether a debtor being above or below the median income is relevant to the determination of "projected disposable income."

### Analysis

*"Projected Disposable Income" Is Not Limited to Form B22C Income*

■ As discussed above, all four courts considering this issue to date have reached the conclusion that, by using the term *"projected* disposable income," rather than "disposable income," Congress meant for the amount required to be committed to the plan in § 1325(b)(1)(B) be something more than the "monthly disposable income under § 1325(b)(2)" indicated at line 58 of Form B22C. This Court agrees with that conclusion, for all of the sound reasons they cite.

*"Projected Disposable Income" Is Not Different For Below–Median and Above–Median Debtors*

■ The next question, then, is—if "projected disposable income" is not the number on line 58 of Form B22C, what is it? How do debtors and trustees calculate "projected disposable income?" Because *Kibbe* and *McGuire* imply that the answer to that question may be different for below—and above-median income debtors, the Court next considers that distinction.

*Determination of Income*

There are, of course, two factors parties must use in determining how much of a debtor's income is "disposable"—the amount of the debtor's income, and the amount of the debtor's expenses. For both below-median and above-median debtors, the statute dictates that the debtor's income is the income the debtor received from all sources in the six months preceding the month in which the debtor filed the petition (minus Social Security payments, war crimes payments and ter-

rorism payments)—in other words, the debtor's "current monthly income."

If the purpose of the § 1325(b)(1)(B) requirement that a debtor commit all of her "projected disposable income" to a plan is to make sure that the debtor is paying as much as possible each month over the life of the plan to the people to whom she is indebted, however, it makes little sense to freeze the calculation of the debtor's income at a particular—possibly arbitrary—point in time and set that number in stone. It makes even less sense that the point in time at which the calculation is frozen is the time *before* the debtor even began making payments on the plan. Rather, it appears logical that on the·day the debtor proposes a plan for repaying her creditors—theoretically, the date she files the petition for relief—the debtor's actual income as of that date should provide an appropriate starting point for determining how much she can commit to the plan.

The amount of income on Form B22C is not—for either below-median or above-median debtors—necessarily the debtor's income at the moment she proposes her plan. It can be—if the debtor made exactly $2,500 per month for the six months before the month she filed, and makes $2,500 per month on the date she files, the income number on her Form B22C and the income number on her Schedule I will be the same. If, on the other hand, she loses her job a month before filing, the income on her Form B22C will be much higher than her income at the time of filing, giving a false impression that she has more income available to devote to the plan than she actually does. The opposite is true for the debtor who obtains a lucrative job a month before filing—his income on Form B22C will be much lower, giving the impression that he has less to contribute to the plan that he actually does.

*Determination of Expenses*

Under pre-BAPCPA circumstances, the same reasoning would hold true for expenses. If a debtor had $2,000 of actual expenses for five months prior to filing, and then $500 of actual expenses for the last month and post-petition, that part of her income which is "disposable" going forward will be artificially decreased if one uses only the expenses for the six months pre-petition. Likewise, if the debtor had $500 of actual expenses for five months prior to filing, and $2,000 of actual expenses for the last month and post-petition, that part of her income which is "disposable" going forward will be artificially increased if one uses only the expenses for the six months pre-petition.

At least one court has opined that BAPCPA has not changed this particular aspect of the projected disposable income calculation. In *In re Renicker,* 342 B.R. 304 (Bankr.W.D.Mo.2006), the bankruptcy court for the Western District of Missouri noted that new § 1325(b)(2) defines disposable income as current monthly income "less amounts reasonably '*to be expended* ...'" *Id.* at 309–10. The *Renicker* court concluded that the "to be expended" language was prospective, and therefore that parties must use prospective expense numbers in calculating disposable income. *Id.*

The question raised by *Kibbe* and *McGuire* is whether the way a debtor calculates her expenses under BAPCPA changes that reasoning. For below-median income debtors, the answer is no. Under BAPCPA, below-median income debtors calculate their expenses the same way they did before BAPCPA—by recording the actual expenses they incur each month on their Schedule J (and now, on their Form B22C). So the reasoning in the above paragraph holds true for below-median income debtors—using the six months of pre-petition expenses will not always

give a true picture of how much of the debtor's income truly is "disposable," and thus able to be committed to the plan. In such cases, parties should subtract prospective expense numbers—the expenses they actually expect to incur—from their income to calculate projected disposable income.

Under new § 1325(b)(3), above-median income debtors may not deduct from their income their *actual* expenses. Rather, they must use the specific, standardized dollar amounts listed in certain IRS publications. For example, if a single debtor has a gross monthly household income of $2,500 per month, she can deduct $292 for food, $32 for housekeeping supplies, $89 for apparel and services, $33 for personal care products and services, and $110 for "miscellaneous" under the IRS National Living Standards for Allowable Living Expenses. That's it—no more. It doesn't matter if the debtor feels those amounts are unreasonably low, or if the trustee feels those amounts are unreasonably high—those are the amounts the debtor is allowed to deduct from her current monthly income to determine her "disposable monthly income."

Unless, then, the IRS standards change, or unless the debtor's state of residence (the IRS standards are different for the states of Hawaii and Alaska) or household size change, an above-median income debtor's expenses are going to be exactly the same for every one of the six months leading up to the filing of the bankruptcy. Absent those two changes in condition—a move to another state or a change in household size—in the future, the above-median income debtors *prospective* expenses will be exactly the same as her historical expenses.

*Determination of Expenses for Purposes of "Projected Disposable Income"*

So—for the purposes of Form B22C, a below-median debtor's expenses are those they actually expect to incur (subject to a determination of reasonableness by the court if there is an objection), while an above-median income debtor's expenses are standardized and fixed. If, again, the purpose of the "projected disposable income" requirement in § 1325(b)(1)(B) is to make sure that the debtor is committing every penny that he reasonably can to the plan, does this distinction matter? Looking to the intent behind the BAPCPA changes, the answer to that question is yes—but to no practical effect.

Many courts, including this one, have been reluctant to speculate about Congress' intent in passing various portions of the BAPCPA legislation. A thoughtful review of some portions of the statute, however, gives the reader the distinct impression that one of Congress' concerns was that there were debtors who were filing for bankruptcy when they should not have been. In other words, Congress appears to have been concerned that there were people who could afford to pay their creditors either all of what they owed or a portion of it, but who were manipulating the bankruptcy system to avoid having to do so.

One can see this concern manifested in a number of places in the statute. In § 109(h) of the statute, for example, Congress tells debtors right out of the gate that they cannot even qualify as "debtors" unless they become educated about debt management. The statute requires them to obtain a credit briefing before they can even qualify as debtors. As discussed previously, Congress set up in § 707(b) a rigorous "means test" to weed out those debtors who are filing Chapter 7 even though they appear to have the means to pay off a portion of their debt through a Chapter 13 reorganization.

The expense calculations mandated for above-median income debtors in

§ 1325(b)(3) appear to be spurred by this same concern for abuse. Congress sends above-median income debtors—those folks who make more money than the median income for a household of their size in their state—to the IRS standards used in the means test, and tells them, "Here's how much you're allowed to spend each month for clothing. Here's how much you're allowed to spend each month for food. Here's how much you're allowed to spend each month for housing." It appears that Congress was attempting to avoid a scenario in which an above-median income debtor could reduce his disposable income by claiming what Congress might consider to be unreasonably high expenses.

Some might argue that this setting of spending controls—which seems to be, in effect, what Congress has done—was a good and necessary thing to avoid abuse. Others might argue that it was unnecessary—the bankruptcy system has trustees, part of whose job it is to police debtors' expenses to make sure that those expenses are not unreasonable. Whether this legislation was necessary or reasonable is a discussion for other places and other days. The fact remains: it appears that Congress made an effort in § 1325(b)(3) to set spending limits on above-median debtors.

If that is the case, then for an above-median income debtor, the allowed expense deductions for purposes of calculating "projected disposable income" should, in fact, be those expenses deducted on Form B22C—not the actual expected expenses listed on Schedule J.[3] For the below-median income debtor, the allowed expense deductions for the purposes of calculating "projected disposable income" should be the Schedule J expenses.

### Practical Application—What Should Debtors and Trustees Do?

Where does all of this leave the conscientious debtor (or debtor's counsel) and trustee? It is this Court's conclusion that, in order to determine a debtor's "projected disposable income" for purposes of § 1325(b)(1)(B), the number on Form B22C does *not* end the inquiry for below— or above-median debtors. Whether a debtor is above or below the median income, parties must determine "projected disposable income" by looking at Schedule I to determine the debtor's income at the date the petition was filed. The parties should look to Form B22C to determine which expenses to deduct—reasonable Schedule J expenses for below-median debtors, standardized expenses for above-median debtors. But for income, parties must look to actual income at the time the debtor filed the petition, not the average historical income from the six months before. In short, parties in all cases must use Form B22C and Schedule I to calculate "projected disposable income."

### Consequences for This Case

In the current case, the trustee based his objection on the debtors' failure to commit the full amount from Form B22C to the plan. The trustee did not factor the Schedule I income into this equation. In order to give the trustee time to address this issue, the Court will withhold ruling on the objection, and will set the matter for further hearing on **Thursday, July 20, 2006.**

SO ORDERED.

---

**3.** This also solves the problem noted by the Western District of Missouri in *In re Schanuth*, 342 B.R. 601, 604–06 (Bankr.W.D.Mo. 2006)—the fact that 11 U.S.C. § 101(10A) specifically excludes Social Security benefits from the current monthly income calculation, while a debtor must list those benefits on Schedule I.