In re Paul Clayson **HANKS** and Jerilyn Hanks, Debtors.

No. 06–22777.

United States Bankruptcy Court, D. Utah.

Jan. 9, 2007.

Lee J. Davis, Salt Lake City, UT, for Debtors.

## MEMORANDUM DECISION

JUDITH A. BOULDEN, Bankruptcy Judge.

Paul and Jerilyn Hanks (Debtors) filed a petition under chapter 13 of the Bankrupt-cy Code as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA),[1] and confirmation of the Debtors' proposed chapter 13 plan is pending before the Court. Because of a change in employment, the Debtors' current income reflected on their Schedules I and J is substantially less than the income reflected on Amended Form B22C, and their proposed plan seeks to return a correspondingly smaller amount to unsecured creditors than the amount indicated on line 58 of Amended Form B22C. The chapter 13 trustee filed an objection to confirmation asserting that the proposed plan does not comply with the disposable income requirements of § 1325(b). As a result of this dispute, the Court must decide the meaning of the phrase "projected disposable income" in § 1325(b)(1)(B) and, in so doing, determine which of the emerging BAPCPA case law's various interpretations of the phrase to follow, if any.

The Court has now considered the evidence properly before it, the credibility of the witness and the arguments of counsel, and has made an independent inquiry into applicable case law. As a result, the Court hereby issues the following Memorandum Decision adopting the view that even though the Debtors' current income is substantially less than their pre-filing income, Form B22C is dispositive with respect to an above-median debtor's required return to general unsecured creditors.

## I. FACTS

The Debtors' Amended Statement of Current Monthly Income and Calculation of Commitment Period and Disposable Income (Amended Form B22C) indicates on

---

1. Future statutory references are to title 11 of the United States Code unless otherwise noted.

line 58 that the Debtors have a monthly disposable income of $666.78 that should be paid to general unsecured creditors on a monthly basis for the five-year term of the plan.[2] This produces a total return to general unsecured creditors of $40,006.80.[3] But the Debtors filed a "pot" plan proposing payments of $222/month and a pro rata return of $4,480 to general unsecured creditors based upon their original Schedules I and J showing only $222/month in actual disposable income.

The disparity between the figure on line 58 of Amended Form B22C and the surplus income indicated on Schedule J results from a substantial reduction in income suffered by Mr. Hanks both before and after the date of filing. Mr. Hanks was released prepetition from his employment as a computer programmer making "slightly over" $64,000/year in salary. His monthly gross income reflected on Amended Form B22C, which was a combination of severance pay and unemployment, was listed as $4,040.14 while Mrs. Hanks' monthly gross income was listed as $3,264.45. On the petition date, the Debtors filed Schedules I and J indicating that Mr. Hanks was only receiving $1,660/month in unemployment but was looking for work and that Mrs. Hanks earned $3,257/month in gross wages as a cardiology technician. Amended Schedules I and J were filed the day before the confirmation hearing showing Mr. Hanks' new employment with Clearplay as a contract "movie watcher" screening movies for inappropriate content at the rate of 20 cents for each minute of a movie that he watches. His anticipated future income from this job is $1,934/month; Mrs. Hanks' anticipated income figures were unchanged. Based on the income from Mr. Hanks' new job, Amended Schedule J listed actual surplus income of $310/month.

The claims bar date in the Debtors' case was December 7, 2006, and $52,510.40 in general unsecured claims were timely filed. Thus, assuming none of these claims are ultimately disallowed, a total pot of $40,006.80 would represent a 76% return to general unsecured creditors. But the Debtors indicated at the hearing that their budget could not support payments of $666.78/month to their general unsecured creditors, and so the higher plan payment arguably required by Form B22C would render the plan unfeasible. Accordingly, the Debtors argue that the income figures on Amended Form B22C are not an accurate representation of their actual current income and that their plan should be confirmed at payments of $310/month.

## II. DISCUSSION

■ The trustee does not dispute the accuracy of any of the Form B22C numbers supplied by the Debtors, and neither of the parties challenges the proposition that the end result on line 58 of Form B22C is the monthly amount to be paid to general unsecured creditors for the applicable commitment period. As such, the Court is called upon to determine solely whether, when the trustee or the holder of

2. Form B22C is the incarnation of the detailed statutory income and expense calculations in § 101(10A) and § 707(b)(2) that are incorporated into chapter 13 by § 1325(b) for debtors with incomes above the median income for their respective states (colloquially called "above-median debtors"). The Debtors in this case are above-median debtors, and nobody has alleged that Form B22C does not accurately capture the relevant provisions of

the Bankruptcy Code. Accordingly, and for ease of reference, the Court will only discuss Form B22C with the understanding that it is merely a proxy for the requirements of the statute.

3. Multiplying $666.78/month by 60 months results in a total return to general unsecured creditors of $40,006.80.

an allowed unsecured claim objects to confirmation, deviations from the Form B22C calculations are permitted resulting in a different return to unsecured creditors and, if so, for what reasons. This analysis involves the interplay between several related statutory sections and the phrases "projected disposable income" versus "disposable income."

First, § 1325(b)(1)(B) provides that [i]f the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan—the plan provides that all of the debtor's **projected disposable income** to be received in the applicable commitment period beginning on the date that the first payment is due under the plan will be applied to make payments to unsecured creditors under the plan.

In turn, the immediately following § 1325(b)(2) states that

[f]or purposes of this subsection, the term 'disposable income' means **current monthly income** received by the debtor (other than child support payments, foster care payments, or disability payments for a dependent child made in accordance with applicable nonbankruptcy law to the extent reasonably necessary to be expended for such child) **less amounts reasonably necessary to be expended [as determined in accordance with § 707(b)(2)(A) and (B) ]—**

(A)(i) for the maintenance or support of the debtor or a dependent of the debtor, or for a domestic support obligation, that first becomes payable after the date the petition is filed; and

(ii) for charitable contributions (that meet the definition of 'charitable contribution' under section 548(d)(3)

to a qualified religious or charitable entity or organization (as defined in section 548(d)(4)[)]) in an amount not to exceed 15 percent of gross income of the debtor for the year in which the contributions are made; and

(B) if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business.

The Debtors argue that Form B22C is not dispositive as to the amount that their plan must return to general unsecured creditors. Rather, they argue that although the artificial calculations in Form B22C are useful in arriving at the "applicable commitment period" in § 1325(b)(4), the amount to be paid to general unsecured creditors in this case should be determined based on actual future income because of the Debtors' "substantial and material change in circumstances." In the Debtors' view, and relying upon *In re Jass*,[4] requiring a return to general unsecured creditors of $666.78/month based on the historical income and statutory expense numbers utilized by Form B22C would render the word "projected" in § 1325(b)(1)(B) meaningless. The Debtors offered no explanation in oral argument as to why "substantial and material change in circumstances" was the appropriate standard for deviating from Form B22C to look at actual income, other than their logic that "we should base a debtor's ability to pay on his current income, not on a figure pulled from air based on his previous income."

Many courts have addressed the "projected disposable income" issue raised by the Debtors' case, and two broad lines of authority have emerged on the subject.

4. 340 B.R. 411 (Bankr.D.Utah 2006) (Thurman, J.).

*In re Alexander*[5] is emblematic of the minority view that Form B22C is dispositive with respect to an above-median debtor's required return to general unsecured creditors. If an above-median debtor's current monthly income minus the allowed expenses under § 707(b)(2)(A) and (B) results in a positive number on line 58 of Form B22C, then that number is the minimum amount that must be paid to general unsecured creditors on a monthly basis. If the line 58 number is negative, then no return at all to general unsecured creditors is required. "[O]ne simply takes the calculation mandated by § 1325(b)(2) and does the math." [6]

Although the majority position opposes the reasoning of *Alexander* and relies heavily or wholly on the alleged distinction between "disposable income" and "projected disposable income," there is little agreement among the cases beyond that basic proposition. Some cases essentially continue to use Schedules I and J as a matter of course to determine plan payments and percentage returns for above-median debtors in accordance with pre-BAPCPA practice.[7] Some either explicitly hold or otherwise suggest that the concept of good faith is a possible determinant of the return to general unsecured creditors.[8] And some establish a presumption in favor of using the Form B22C calculations unless a party in interest can demonstrate a substantial change in the debtor's circumstances.[9]

After a thorough review of the Bankruptcy Code and the case law discussing the issue, this Court is compelled to adopt the reasoning of *Alexander* and reject the majority position in all its variations. In doing so, the Court agrees with cases such as *Jass* that the language of § 1325(b), while complex, is unambiguous. But the Court respectfully disagrees with the majority's approach to the definition of the term "projected" and the weight ascribed to that one word. For example, some cases define the word "projected" to mean "to calculate, estimate, or predict (something in the future), based on present data or trends." [10] From this, they conclude that because the word "projected" is "future-oriented," then it must necessarily follow that "[t]he significance of the word 'projected' is that it requires the Court to consider both future and historical finances of a debtor in determining compliance with § 1325(b)(1)(B)." [11] But stating that "projected" is a future-oriented word says nothing about the import of that word as used in § 1325(b)(1)(B).

■ To the contrary, application of this definition of "projected" actually argues against the majority position. Starting with the number on line 58 of Form B22C as the "present data"—which relies on the underlying concepts of "disposable income" and "current monthly income"—the stat-

---

**5.** 344 B.R. 742 (Bankr.E.D.N.C.2006); *see also In re Farrar–Johnson,* 353 B.R. 224 (Bankr.N.D.Ill.2006).

**6.** *Alexander,* 344 B.R. at 749.

**7.** *See, e.g., In re Kibbe,* 342 B.R. 411 (Bankr. D.N.H.2006); *In re Grady,* 343 B.R. 747 (Bankr.N.D.Ga.2006).

**8.** *See, e.g., In re LaSota,* 351 B.R. 56 (Bankr. W.D.N.Y.2006); *In re Edmunds,* 350 B.R. 636 (Bankr.D.S.C.2006). The parties in this case did not argue their positions on the basis of

"good faith" plan filing under § 1325(a)(3), and the Court does not address at this time whether the return to general unsecured creditors is an element of good faith.

**9.** *See, e.g., Jass,* 340 B.R. 411; *In re Pederson,* No. 06–00635S, 2006 WL 3000104 (Bankr. N.D.Iowa Oct.13, 2006).

**10.** *Jass,* 340 B.R. at 415; *see also Edmunds,* 350 B.R. at 646.

**11.** *Jass* at 415–16.

ute then requires courts to "calculate, estimate, or predict" how much must be returned to general unsecured creditors over the applicable commitment period. In fact, this process is no different than what courts used to do in pre-BAPCPA practice except that courts previously calculated the plan return using the average, estimated, and fluid numbers in Schedules I and J rather than the average, estimated, and partially standardized numbers in Form B22C.[12] And neither method is particularly realistic.[13] In "projecting" a return to general unsecured creditors under the BAPCPA for above-median debtors, this Court's view is that its new function is solely to multiply the net "disposable income" figure as calculated on Form B22C by the applicable commitment period. No more, no less.

█ Several opinions in the majority line of cases give other reasons to support their holdings, but none of these reasons individually or collectively is persuasive enough to overcome the plain language of the statute. First, even if the word "projected" needs to be given meaning in the abstract to avoid it being mere surplusage, the Supreme Court has made clear that the "preference for avoiding surplusage constructions is not absolute" and can be "offset by the canon that permits a court to reject words as surplusage if inadvertently inserted or if repugnant to the rest of the statute."[14] Applying this principle to the present case, one word clearly should not be elevated in importance so as to gut an entire statutory scheme enacted by Congress. In *In re Hardacre*, the court stated that current monthly income calculations would still be relevant at least to describe "the sources of revenue that constitute income, as well as those that do not,"[15] while the Debtors in the present case argued that "disposable income" is really just a determinant of the applicable commitment period in § 1325(b)(4). Both of these views require the unjustifiable deletion of several pages of the Bankruptcy Code in the name of a single word.[16]

**12.** It is for these same reasons that the phrases "as of the effective date of the plan" and "to be received" in § 1325(b)(1)(B) do not support the majority's position as alleged by some cases. *See, e.g., Kibbe*, 342 B.R. at 415; *cf. In re Fuger*, 347 B.R. 94, 98 (Bankr. D.Utah 2006) (Thurman, J.) (recognizing that the old § 1325(b)(1)(B) required debtors to "*project* income into the future [over 3 to 5 years], and commit to pay that amount into the chapter 13 plan" rather than the "actual disposable income received by the debtor, which could be a greater amount") (emphasis in original, internal quotes omitted).

**13.** *In re Rotunda*, 349 B.R. 324 (Bankr. N.D.N.Y.2006); *see also In re Guzman*, 345 B.R. 640 (Bankr.E.D.Wis.2006) (contrasting the "rear view mirror" of current monthly income with the "crystal ball" view of current and future disposable income).

**14.** *Lamie v. U.S. Trustee*, 540 U.S. 526, 536, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004) (quoting *Chickasaw Nation v. U.S.*, 534 U.S. 84, 94, 122 S.Ct. 528, 151 L.Ed.2d 474

(2001)) (internal quotes omitted); *see also Dole v. United Steelworkers of Am.*, 494 U.S. 26, 35, 110 S.Ct. 929, 108 L.Ed.2d 23 (1990) ("Our starting point is the language of the statute, but in expounding a statute, we are not guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy."); *In re Wagers (Redmond v. Lentz & Clark, P.A.)*, 355 B.R. 268 (10th Cir. BAP 2006) (discussing *Lamie); Alexander*, 344 B.R. at 752 ("The [chapter 13] system was not broken. Whether it can survive the changes mandated by BAPCPA remains to be seen. But the court's job is to interpret the new statute as clearly written, not to nostalgically preserve the past by seizing on isolated words such as 'good faith' and 'projected' and inflating their meaning beyond justification.").

**15.** 338 B.R. 718, 723 (Bankr.N.D.Tex.2006).

**16.** The Court also disagrees substantively with the Debtors' argument regarding the purpose of the "disposable income" concept in

This Court also finds unpersuasive the various policy arguments set forth in some of the cases in the majority line that appear unsupported and conclusory, and seem rooted in the pre-BAPCPA Bankruptcy Code. For example, *Grady* states that "[c]ertainly the proponents of BAPCPA did not intend to close the bankruptcy court doors to debtors who voluntarily, and in good faith, seek to repay creditors with the funds they actually have on hand each month." [17] *Jass* talks about the fresh start policy of the Bankruptcy Code and the possibility that a contrary result "would essentially foreclose the potential for bankruptcy relief from a group of chapter 13 debtors who are otherwise eligible for relief." [18] And *In re Fuller* discusses how freezing income and expense calculations at a particular point in time makes "little sense" if the purpose of § 1325(b)(1)(B) is to make sure that a debtor is paying as much as possible each month over the life of the plan to the people to whom she is indebted. [19]

But what about the competing policies that are at play in the BAPCPA? The court in *In re Ott* discussed the "lens" through which Congress apparently viewed debtors in enacting the BAPCPA, the creditor-friendly nature of most of the BAPCPA's provisions, and Congress' perception of abuse and lack of personal financial accountability on the part of debtors in bankruptcy. [20] Whether justified or not, the result of Congress' efforts was "a law that is sometimes self-executing, inflexible, and unforgiving." [21] It is not at all clear that Congress did not actually intend to keep people out of bankruptcy altogether if possible or perhaps to push them into individual chapter 11 cases, nor is it clear that a "fresh start" is still the overriding policy of the portions of the Bankruptcy Code at issue in this case. Perhaps the concept of current monthly income is an expression of Congress' intent that debtors should attempt to resolve their financial difficulties outside of bankruptcy for a period of time before filing. Indeed, this view would jibe with the new prepetition briefing requirement in § 109(h)(1) that contemplates meaningful credit counseling and the performance of budget analyses within six months of filing as well as the requirement in § 521(b)(2) that the debtor file a copy of any debt repayment plan developed during the prepetition counseling session. [22]

■ The *Fuller* court's unsupported assertion regarding the payment-maximization purpose of § 1325(b)(1)(B) is also unclear at best. [23] In fact, a cursory review of the income exclusions and expense deduc-

---

§ 1325(b)(2). Disposable income is a net figure of current monthly income minus reasonably necessary expenses. It is only the current monthly income aspect of that equation that is relevant to calculating the applicable commitment period.

17. *Grady,* 343 B.R. at 752.

18. *Jass,* 340 B.R. at 417.

19. *In re Fuller,* 346 B.R. 472, 483 (Bankr. S.D.Ill.2006).

20. 343 B.R. 264 (Bankr.D.Colo.2006).

21. *Id.* at 266.

22. *See also* § 502(k)(1) (allowing courts to reduce unsecured consumer creditors' claims by up to 20% if they "unreasonably refused to negotiate a reasonable alternative repayment schedule proposed on behalf of the debtor by an approved nonprofit budgeting and credit counseling agency"); § 547(h) (prohibiting avoidance of transfers "made as a part of an alternative repayment schedule between the debtor and any creditor of the debtor created by an approved nonprofit budgeting and credit counseling agency").

23. The Court is well aware of statements such as the one in the Purpose and Summary section of the BAPCPA House Report expressing the view that the means testing mechanism

tions allowed under the BAPCPA suggests other purposes at work. The income aspect of the "disposable income" calculus specifically excludes such items as child support, foster care, and child disability payments reasonably necessary for the child's care as well as amounts required to repay 401(k) loans, benefits received under the Social Security Act, payments to victims of war crimes, and payments to victims of international or domestic terrorism.[24] In turn, debtors may in appropriate circumstances deduct expenses for elder care, care of disabled or chronically ill relatives, private school tuition, housing and utility expenses beyond actual incurred expenses, secured debts, and possibly charitable contributions up to 15 percent of annual gross income.[25] Whatever policies are at work in these provisions and however laudable they may be, they do not

appear to further a goal of maximum repayment to all creditors. And all of this is to say nothing of the fact that "[o]ne of the aims of the means test was to limit judicial involvement—and so judicial discretion— by making mechanical the determination of abuse under section 707(b). The means test in section 1325(b)(3) is meant to have the same mechanical effect." [26]

That said, § 1325(b)(3)'s incorporation of subparagraphs (A) *and* (B) of § 707(b)(2) does provide courts with a very limited ability to adjust both income and expenses under § 707(b)(2)(B)(i) based on a showing of "special circumstances, such as a serious medical condition or a call or order to active duty in the Armed Forces, to the extent such special circumstances that [sic] justify additional expenses or adjustments of current monthly income for which there is no reasonable alternative." [27] Mr.

---

"is intended to ensure that debtors repay creditors the maximum they can afford." H.R. 109–031, Part I, Bankruptcy Abuse Prevention and Consumer Protection Act of 2005. But such statements are insufficient to overcome both the plain language of the statute and the statements' apparent conflict with other policies at play in the BAPCPA.

**24.** *See* § 1325(b)(2) (excluding "child support payments, foster care payments, or disability payments for a dependent child made in accordance with applicable nonbankruptcy law to the extent reasonably necessary to be expended for such child" from the definition of current monthly income); § 1322(f) (stating that "any amounts required to repay [a loan described in section 362(b)(19)] shall not constitute 'disposable income' under section 1325"); § 101(10A) (excluding "benefits received under the Social Security Act, payments to victims of war crimes or crimes against humanity ..., and payments to victims of international terrorism ... or domestic terrorism" from the definition of current monthly income).

**25.** *See* § 707(b)(2)(A)(ii)(II) (allowing deduction of expenses "for care and support of an elderly, chronically ill, or disabled household member or member of the debtor's immediate family" in appropriate circumstances);

§ 707(b)(2)(A)(ii)(IV) (allowing deduction of expenses up to $1,500 annually per minor child "to attend a private or public elementary or secondary school" in appropriate circumstances); § 707(b)(2)(A)(ii)(V) (allowing deduction for extra housing and utility expenses beyond those outlined in the Internal Revenue Services' Local Standards in appropriate circumstances); § 707(b)(2)(A)(iii) (allowing deduction for certain secured debt payments); § 1325(b)(2)(A)(ii) (allowing expenses of up to 15% of a debtor's annual gross income for qualifying "charitable contributions"). The House of Representatives gave final approval to S. 4044, the Religious Liberty and Charitable Donation Clarification Act, on December 6, 2006. If signed by President Bush as expected, the new law would overrule cases such as *In re Diagostino*, 347 B.R. 116 (Bankr.N.D.N.Y.2006) and permit ongoing charitable contributions by both above-median and below-median income debtors.

**26.** *Farrar–Johnson,* 353 B.R. at 229 (internal citation omitted).

**27.** Section 707(b)(2)(B)(ii), (iii), and (iv) sets forth additional documentation, attestation, and monetary requirements that need not be addressed at this time. Although the first two

Hanks presented credible testimony regarding his job loss, employment search efforts, and the relative income at his new employment. But unfortunately, none of these things rises to the level of "special circumstances ... for which there is no reasonable alternative" as contemplated by the statute. The statutory examples of serious medical conditions and active military service, although not exhaustive, are instructive of the kinds of "special circumstances" that would justify deviations from Form B22C under the principle of *ejusdem generis*.[28] Mr. Hanks testified to the possibility of obtaining roughly similar employment to his prior computer programming job in the relatively near future, but even so, "reasonable alternatives" may also exist in the form of a second job or overtime work for either of the Debtors, a reduction in actual expenses, assistance from family, or the like.

 Ultimately, it is not within this Court's power nor is it this Court's role to change Congress' intentional policy choices or to save it from its inadvertent drafting errors.[29] The language of the statute is plain, and the conflicting policies at work in the Bankruptcy Code as amended by the BAPCPA do not provide a useful guide for interpreting the phrase "projected disposable income" in § 1325(b)(1)(B) in a different manner. Although the Court certainly appreciates the logic and desire of returning to a chapter 13 practice that more closely resembles pre-BAPCPA practice, a harsh or even illogical result is not the same thing as an absurd result, and this Court must therefore interpret the statute according to its own terms. Accordingly, the Court must deny confirmation of the Debtors' proposed plan without prejudice.[30] The Debtors will have 45 days in which to file an amended plan and set a continued confirmation hearing, or the case shall be dismissed.

## III. CONCLUSION

It bears repeating that Congress' function is to legislate while the Court's function is to interpret and apply the law as written instead of a law that the Court might find more logical or reasonable. Because of this principle and for the reasons set forth above, the Court is compelled to hold that Form B22C is determinative of the return to general unsecured creditors for above-median debtors unless "special circumstances" can be shown under § 707(b)(2)(B). The Court will issue an appropriate Order in accordance with this Memorandum Decision.

---

of these requirements are not problematic when imported into the chapter 13 context, the monetary limits in § 707(b)(2)(B)(iv) may be troublesome in the chapter 13 context if applicable at all.

28. *See, e.g., In re Ludwig,* 345 B.R. 310, 318 (Bankr.D.Colo.2006) (discussing the principle of *ejusdem generis* that "general terms are applied only to those things of the same general kind or class as those specifically mentioned") (internal quotes and citation omitted).

29. *Lamie,* 540 U.S. at 542, 124 S.Ct. 1023; *see also Farrar–Johnson,* 353 B.R. at 229 ("It is not the courts' place to rewrite the statute, turning it into something they consider more logical, sensible, or conducive to human progress and enlightenment.").

30. The Court disagrees with those cases in the majority line that find further support for their position in the mere existence of the postconfirmation modification provisions of § 1329. What may or may not be permitted following confirmation of a plan is not instructive on what must be done at the actual confirmation hearing, and the Court takes no view at this time on the scope or extent of permissible postconfirmation modifications.