In re Monica L. BRISCOE, Debtor.

No. 06–00458.

United States Bankruptcy Court,
District of Columbia.

Sept. 4, 2007.

Scott D. Arnopol, Washington, DC, for Debtor.

Cynthia A. Niklas, Washington, DC, for trustee.

*MEMORANDUM DECISION REGARDING CHAPTER 13 TRUSTEE'S OBJECTION TO CONFIRMATION OF DEBTOR'S FIRST AMENDED PLAN*

S. MARTIN TEEL, JR., Bankruptcy Judge.

This case is governed by the Bankruptcy Code (11 U.S.C.) as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. No. 109–8, 119 Stat. 23 (generally effective Oct. 17, 2005) ("BAPCPA"). The parties are in agreement that 11 U.S.C. § 1325(b)(3) applies to the calculation of the debtor's projected disposable income under 11 U.S.C. § 1325(b)(1)(B), and that under § 1325(b)(3) her housing expense must be determined, as mandated by 11 U.S.C. § 707(b)(2), by first looking to the "Local Standards" that the Internal Revenue Service ("IRS") has issued relating to such housing expenses. The debtor asserts that the Local Standards housing expense applicable to the debtor applies for purposes of § 1325(b)(1)(B) even though her actual housing expense is less. In contrast, the chapter 13 trustee contends that, consistent with the methodology of the Financial Analysis Handbook of the Internal Revenue Manual (the "IRM"), the Local Standards act as only a cap on the amount of the expenditure that the debtor may claim in calculating a disposable income figure, and that the debtor's actual housing expense, when less than the Local Standards figure, should be employed in making the calculation. For the reasons that follow, I conclude that the debtor is entitled to use the Local Standards figure even if her actual housing expense figure

is lower.[1] I additionally conclude that the debtor's plan complies with the requirement of 11 U.S.C. § 1325(b) regarding commitment of all of her *projected* disposable income, and with the requirement of 11 U.S.C. § 1325(a)(3) that the plan be proposed in good faith. Accordingly, I will overrule the chapter 13 trustee's objection to confirmation of the debtor's plan.

## I

## STATUTORY FRAMEWORK

When a debtor seeks relief under chapter 13 of the Bankruptcy Code, 11 U.S.C. § 1301 *et seq.*, the Code requires that the debtor file a repayment plan with the court. 11 U.S.C. § 1321. If the requirements for the plan set forth in §§ 1322 and 1325 of the Bankruptcy Code are met, the plan will be confirmed and the debtor will be eligible to receive an order discharging most if not all of his debts once its terms are effectuated. 11 U.S.C. § 1328(a). If the plan does not comport with the requirements of §§ 1322 and 1325, the debtor will need to file an amended plan of reorganization; otherwise, his case will be converted to chapter 7 of the Bankruptcy Code, 11 U.S.C. § 701 *et seq.*, or dismissed outright. 11 U.S.C. § 1307(c)(5).

One of the requirements set forth in § 1325 is that "the plan provide[ ] that all of the debtor's projected disposable income . . . be applied to make payments to unsecured creditors." 11 U.S.C. § 1325(b)(1)(B). Section 1325(b)(2) defines disposable income as "current monthly income received by the debtor . . . less amounts reasonably necessary to be expended." "[A]mounts reasonably necessary to be expended . . . shall be determined in accordance with subparagraphs (A) and (B) of section 707(b)(2), if the debtor has [annualized] current monthly income . . . greater than . . . the median family income of the applicable State." 11 U.S.C. § 1325(b)(3)(A). In turn, § 707(b)(2) (which sets forth a means test for determining whether a debtor's chapter 7 case is presumptively abusive), states that the "debtor's monthly expenses *shall be* the debtor's *applicable* monthly expense amounts specified under the National and Local Standards . . . issued by the Internal Revenue Service for the area in which the debtor resides." *Id.* at § 707(b)(2)(A)(ii)(I) (emphasis added).[2]

The debtor's calculation of disposable income in her statement of current monthly income (Official Form 22C) includes a deduction for rent in the amount of $1,012—the expense for rent listed in the Local Standards table—even though the

---

1. This decision reaches a result contrary to my previously vacated oral decision of June 22, 2007, in this case, and my prior oral decision regarding this issue in a separate chapter 13 case involving an entirely different debtor, *In re Hare*, Case No. 06–00106 (Bankr.D.D.C.). The debtor in *Hare* modified her plan to provide for full repayment of unsecured claims following my ruling, and an order confirming the modified plan was entered shortly thereafter. My ruling today abrogates entirely my oral ruling in *Hare*.

2. At least one court has concluded that "[§ ] 1325(b)(3) should not be interpreted as categorically substituting the [§ ] 707(b)(2) expense restrictions for the 'reasonably neces-

sary' expense requirement already imposed by [§ ] 1325(b)(2)," but instead "should be interpreted as offering a further guideline for ensuring that the expenses claimed by an above-median-income debtor are reasonably necessary." *In re McGillis*, 370 B.R. 720, 730–31 (Bankr.W.D.Mich.2007). I respectfully disagree with this analysis. Section 1325(b)(3) does not supplement the phrase "amounts necessary to be expended" in § 1325(b)(2)—it defines it. The only possible criteria for determining the reasonableness of a particular expense for purposes of calculating a debtor's disposable income are those set forth in § 707(b)(2).

debtor's actual monthly rent is only $446.[3] The first question for the court is whether Congress intended for debtors to use the Local Standards as fixed deductions in the calculation of disposable income for above median-income debtors or intended for courts to apply the Local Standards in a manner consistent with the Financial Analysis Handbook, which directs that "taxpayers will be allowed the local standard or the amount actually paid, whichever is less." IRM § 5.15.1.7(4). If Congress intended the former course of action, the court must then consider whether the debtor's calculation of current monthly income on Official Form 22C controls the calculation of her "projected disposable income" for purposes of § 1325(b)(1). Finally, if the court finds that the debtor's current monthly income as derived from Official Form 22C dictates the debtor's "projected disposable income" under § 1325(b)(1), it must decide whether a chapter 13 plan of repayment that provides less funding to unsecured creditors than the debtor could actually afford satisfies the requirement of § 1325(a) that the plan "be proposed in good faith." 11 U.S.C. § 1325(a)(3).

## II

### INTERPRETATION OF 11 U.S.C. § 707(b)(2)

Like so many issues raised by BAPCPA's amendments to the Bankruptcy Code, the question of whether Congress intended for the values contained within the Local Standards of the Financial Analysis Handbook to serve as fixed values or caps in determining a debtor's monthly expenses is a hotly contested one. Most courts have held that the figures set forth in the Local Standards should apply regardless of the debtor's actual expenses,[4]

3. The $1,012 figure comes from the Local Standards table for housing expenses. That table gives housing expense values organized by the date at which the bankruptcy was filed, the state of residence, and household size. In this case, the debtor filed her petition in November of 2006, lives in the District of Columbia, and has a household size of one. The corresponding housing expense is $1,012 per month. USDOJ.com, Bankruptcy Allowable Living Expenses (Cases Filed Between October 1, 2006, and January 31, 2007, Inclusive), http://www.usdoj.gov/ust/eo/bapcpa/20061001/bci_data/housing_charts/irs_housing_charts_DC.htm (last visited Aug. 30, 2007).

4. See In re Sawdy, 362 B.R. 898, 911–13 (Bankr.E.D.Wis.2007) ("above-median-income debtors may deduct the Local Standard[s] amount, regardless of whether they have an actual ownership expense"); In re Farrar–Johnson, 353 B.R. 224, 230 (Bankr. N.D.Ill.2006) ("The debtors were entitled to claim [the Local Standards expense] whether they had it or not."); In re Fowler, 349 B.R. 414, 415–421 (Bankr.D.Del.2006) ("[b]y reference to the National and Local Standards, Congress intended the [c]ourt to use a chart of standard expenses for all debtors which could be easily and uniformly applied"); In re Demonica, 345 B.R. 895, 903 (Bankr.N.D.Ill. 2006) (holding that "a debtor may claim the full Local Standard expense for housing"); In re Grunert, 353 B.R. 591, 594 (Bankr.E.D.Wis. 2006) ("Treating the Local Standard deductions for vehicle ownership as fixed allowances rather than caps on actual expenses is supported by the plain meaning of the statute ('applicable' versus 'actual'), the legislative history, and carefully reasoned caselaw."); In re McGuire, 342 B.R. 608, 613 (Bankr. W.D.Mo.2006) ("[I]f the expense is applicable (because the debtor is actually incurring expenses for the purchase or lease of a vehicle), then because the monthly ownership amount 'shall be' the 'amount specified' in the Standards, § 707(b)(2)(A)(ii)(I) mandates that the debtor is permitted to claim an expense deduction for the full Standard amount on Form B22C." (Emphasis in original.)); In re Chamberlain, 369 B.R. 519, 521–26 (Bankr.D.Ariz. 2007) (holding that the "specified amounts" in the National and Local Standards "are to be used"); In re Zaporski, 366 B.R. 758, 765 (Bankr.E.D.Mich.2007) (finding "most persuasive ... the line of cases that conclude that the IRS Local Standards are fixed allow-

but a handful of courts have concluded that because the Financial Analysis Handbook applies the lesser of the values set forth in the Local Standard or the debtor's actual expenses, courts should do the same in applying § 707(b)(2).[5] Each side believes that it is following the plain meaning of the statute, and the statutory text must serve as the starting point for this court's analysis as well. *See United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) ("The plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.' ").

Section 707 (b)(2)(A)(ii)(I) mandates that the debtor's monthly expenses "shall be," *inter alia*, the *"applicable* monthly expense amounts specified under the . . . Local Standards." (Emphasis added). The key to understanding the provision is the modifier "applicable." The common meaning of the word is "capable of being applied; having reference" or "fit or suitable for its purpose, appropriate." *Oxford English Dictionary* vol. I at 575 (2d ed.1989). But to what do the "monthly expense amounts" described in the provision "hav[e] reference?" This question is fraught with difficulty, as Judge Markell of the Bankruptcy Court for the District of Nevada noted in a recent decision addressing the provision at issue. Quoth Judge Markell:

> What does the word 'applicable' mean in this context? Does it mean, as the debtor suggests, that you cross-match the debtor's location and status against the standards as published, and no more? Or does it mean, as the trustee contends, that this court should interpret the standards as the IRS would, including any direction or discretion given to IRS employees by the IRS internal publications?

*In re Slusher*, 359 B.R. at 307–08; *see also In re Farrar–Johnson*, 353 B.R. at 230 ("An expense could be 'appropriate' for a debtor to claim because he actually incurs that expense. It could also be 'appropriate' to claim because he lives in a certain state and county and has a household of a certain size, putting him in the right box on the Local Standards chart.").

Judge Markell opted to interpret "applicable" as meaning the Local Standard expense as adjusted by the IRM, reasoning that "[i]n referring to such specialized standards, it would be quite odd if Congress intended to preclude courts from examining the context in which the authoring agency . . . used and employed those standards." *In re Slusher*, 359 B.R. at 309. From his perspective, if Congress did not want the complete Local Standards equa-

---

*ances*, and not caps on a debtor's *actual* expenses" (emphasis in original)); *In re Watson*, 366 B.R. 523, 524–30 (Bankr.D.Md.2007) ("Without [ ] belaboring the issue further, this court adopts not only the conclusion but the reasoning set forth in *In re Fowler*.").

5. *See In re Rezentes*, 368 B.R. 55, 61–62 (Bankr.D.Haw.2007) ("I conclude that, for purposes of calculating projected disposable income, debtors may deduct the local standard housing expense or their actual housing expense, whichever is less."); *In re Slusher*, 359 B.R. 290, 309 (Bankr.D.Nev.2007) ("For better or worse, Congress referred to the IRS

National and Local Standards in Section 707(b)(2)(A). To understand what requirements this incorporation imposes would seem to require courts to look at how the IRS defines these categories, and how the IRS calculates those expenses."); *In re Hardacre*, 338 B.R. 718, 724–28 (Bankr.N.D.Tex.2006) ("Because the Local Standards are issued by the Internal Revenue Service, it is instructive to refer to publications of that organization for guidance as to the types of 'debt payments' that can reduce allowances under the Local Standards.").

tion to apply, "it would have written [§ ] 707(b)(2)(A)(ii)(I) to read, 'The debtor's monthly expenses shall be the monthly expense amounts specified under the National Standards and Local Standards . . . rather than 'The debtor's monthly expenses shall be *the debtor's applicable* monthly expense amounts specified under the National and Local Standards. . . .'" *Id.* at 309 (emphasis in original). The *Rezentes* court echoed this sentiment. 368 B.R. at 61–62 ("If Congress had intended to adopt the IRS Standards but prevent the courts from looking to the IRS's own interpretations of its standards, it seems reasonable to expect that it would have said so explicitly."). An additional argument supporting this view is that it seems quite odd that, for purposes of calculating the disposable income that must be paid under a chapter 13 plan, a below-median income debtor is limited to actual housing expenses whereas an above-median income debtor can take the Local Standards housing expense even though his actual expense is less.

Most courts disagree with Judge Markell. They focus on language found later in the same sub-part of § 707(b)(2) regarding "categories specified as Other Necessary Expenses" under the Financial Analysis Handbook, for which the debtor may only claim *"actual* monthly expenses." 11 U.S.C. § 707(b)(2)(A)(ii)(I) (emphasis added). Because Congress used the term "actual" in one context (Other Necessary Expenses) and the term "applicable" in another context (National and Local Standards), these courts reason that the term "applicable" cannot mean

"actual," and conclude that the phrase "applicable monthly expense amounts" cannot refer to actual monthly expenses as a consequence. *In re Demonica,* 345 B.R. at 902; *accord In re Farrar–Johnson,* 353 B.R. at 230–31; *In re Grunert,* 353 B.R. at 593; *In re Zaporski,* 366 B.R. at 764.[6]

At first blush, the interpretation of the statute by the courts in *Slusher* and *Rezentes* would seem to be the more intuitive reading of § 707(b)(2). It does seem "quite odd" for Congress to have passed a law that directs the reader to numerical values promulgated by the IRS without intending for the reader to understand the context in which those numbers are used. The approach taken by these courts has the added virtue of fulfilling Congress' desire in amending § 707(b)(2) to "ensure that debtors repay creditors the maximum they can afford." H.R.Rep. No. 109–31, pt. 1, at 2 (2005), *as reprinted in* 2005 U.S.C.C.A.N. 88, 89. Moreover, I agree with Judge Markell that the terms "applicable" and "actual," while obviously different, need not be mutually exclusive. *See In re Slusher,* 359 B.R. at 308 (reasoning that the term "actual" could refer to "a limited deduction within the specified categories of Other Necessary Expenses," whereas the term "applicable" could refer to "a deduction limited to the amount and type specified by the IRS").

But looks can be deceiving, and in this case the arguments which seemed so appealing to me when I first considered this issue betray some flaws upon closer inspection. In the first place, there is some logic in looking only at the values set forth in the Local and National Standards with-

---

6. The *Farrar–Johnson* court explained this rationale as follows:

> Congress drew a distinction in the statute between "applicable" expenses on the one hand and "actual" expenses on the other. "Other Necessary Expenses" must be the debtor's "actual" expenses. Expenses un-

> der the "Local Standards," in contrast, need only be those "applicable" to the debtor—because of where he lives and how large his household is. It makes no difference whether he "actually" has them.
> 353 B.R. at 230–31.

out considering the manner in which those values are used by the IRS. All but one of the values set forth in the National Standards "come from the Bureau of Labor Statistics (BLS) Consumer Expenditure Survey," IRM § 5.15.17, and the operational costs included in the transportation expense value set forth in the Local Standards "were derived from BLS data." *Id.* Those values not derived from BLS data were created by using either a fixed rate (for miscellaneous expenses included in the National Standards) or by determining reasonable expense amounts on a county-by-county basis (for the values listed in the Local Standards). *Id.*

Regardless of the source of the values, the point is that the IRS collected and applied objective data in supplying values for the National and Local Standards. This raw data is readily adaptable for use in other contexts. The provisions of the Financial Analysis Handbook dictating how that data should be used are not so malleable. They are instructions directed at a specific audience (tax collectors) for a specific purpose (collecting delinquent taxes). Assuming that Congress did not intend for debtors and the courts and trustees that oversee them to become amateur tax collectors, it would be much odder for Congress to have imported the IRS's internal collection procedures into the Bankruptcy Code than for Congress to have referred to the objective data used in applying those procedures without requiring debtors to follow the procedures themselves. *See In re Chamberlain,* 369 B.R. at 525–26 ("The IRS is not an administrative agency that administers the Bankruptcy Code, so there is no basis for a [c]ourt to defer to its administrative expertise.").

Such an approach seems odder still when one considers the function of § 707(b)(2). "[A] means test reduction for a vehicle ownership expense is only relevant for purposes of determining the existence or non-existence of a presumption of abuse," *In re Zaporski,* 366 B.R. at 767–68, and "[p]resumptions are typically created to avoid litigation." *In re Fowler,* 349 B.R. 414, 420 (Bankr.D.Del.2006). "Therefore, if the means test is intended to create a statutory presumption to determine abuse, it follows that 'Congress intended [for] the [c]ourt to use a chart of standard expenses for all debtors which could be easily and uniformly applied.' " *In re Zaporski,* 366 B.R. at 767–68 (quoting *In re Fowler,* 349 B.R. at 420–21); *see also In re Devilliers,* 358 B.R. 849, 862 (Bankr. E.D.La.2007) ("The IRS standard deductions provide a uniform and predictable standard for determining the appropriate level and deductibility of fluctuating and widely varying expenditures."). In other words, the detailed methodology set forth within the Financial Analysis Handbook is not only foreign to the means testing scheme set forth in § 707(b)(2), but also antithetical to its purpose.

Ultimately, though, it is the language of § 707(b)(2) itself that is most convincing in interpreting the statute. The provision at issue refers to "applicable monthly expense amounts specified *under the ... Local Standards,*" 11 U.S.C. § 707(b)(2)(A)(ii)(I), not "applicable monthly expense amounts specified under the Financial Analysis Handbook of the Internal Revenue Manual" or, more simply, "applicable monthly expense amounts specified under the Internal Revenue Manual." This is not a trivial distinction. As Judge Wedoff notes in a comprehensive article on the means-testing provisions imposed by BAPCPA, the Local Standards (along with the National Standards) are not located within the Financial Analysis Handbook at all, but rather are found separately on the IRS's website. Eugene R. Wedoff, *Means Testing in the New § 707(b),* 79 Am. Bankr.L.J. 231, 254 (2005). Thus, the reference in § 707(b)(2) to the Local Standards is not a shorthand way of referring

to the Financial Analysis Handbook, but rather denotes an entirely separate source of information.

■ In interpreting the plain language of § 707(b)(2)(A)(ii)(I), "[i]t seems a sound rule of construction to adopt the simplest, most obvious interpretation of statutory language[ ] unless there are clearly shown, persuasive reasons for doing otherwise." *Baker v. Se. Mich. Shippers Co–op. Ass'n,* 376 F.Supp. 149, 156 (D.Mich.1973). The simplest way to interpret the modifier "applicable" is to read it as being subordinate to the same limiting phrase ("specified under the ... Local Standards") as the object ("monthly expense amounts") that it modifies. This reading puts an end to the apparent ambiguity in the term "applicable," for it is clear that, within the context of the Local Standards (as opposed to the Financial Analysis Handbook), the term must refer to the varying expense amounts listed for individuals subject to different circumstances. For example, the "applicable" housing expense for a debtor with a family of two or less in the District of Columbia is $1,012, whereas the "applicable" expense for a debtor in the same locale with four or more persons is $1,369. Bankruptcy Allowable Living Expenses, *supra* n. 3.

The legislative history of BAPCPA supports this reading of § 707(b)(2)(A)(ii)(I). As the bankruptcy court noted in *Fowler,* a prior version of BAPCPA calculated monthly expenses by requiring debtors to apply "the expense allowances under the applicable National Standards, Local Standards, and Other Necessary Expenses allowance ... under *the Internal Revenue Service financial analysis* for expenses in effect as of the date of the order for relief." 349 B.R. at 419 (quoting H.R. 3150, 105th Congress (1998)) (emphasis supplied by *Fowler* court). The phrase "under the Internal Revenue Service financial analysis" is conspicuously absent

from the final version of the amended § 707(b)(2). "The change from the prior version evidences Congress' intent that the [c]ourts not be bound by the financial analysis contained in the IRM . . . ." *Id.*

Finally, the oddity of there being a disparity regarding how disposable income is computed for above-median income debtors (allowing use of the Local Standards housing expense when the actual expense is less) versus below-median income chapter 13 debtors (who are limited to actual expenses) is an insufficient basis for interpreting § 707(b)(2) differently. As Judge Wedoff noted:

> Allowing a deduction for the amounts specified in the Local Standards produces no anomalous results; to the contrary, it serves to reduce administrative complexity and avoid penalizing debtors who choose less expensive housing and transportation in order to have funds available to meet other needs.

Wedoff, *supra,* at 256 n. 62. A presumption of abuse under the means test of § 707(b)(2) can only arise if the debtor is an above-median income debtor. 11 U.S.C. § 707(b)(7)(A). Congress could rationally have decided that above-median income debtors present the greater potential for serious abuse, and to have provided that a presumption of abuse may arise only with respect to such a debtor as a consequence. Congress could also rationally have decided that the means test's presumption of abuse ought to arise from objective data that require as little inquiry as possible into the debtor's actual circumstances, with the burden then shifting to the debtor, as authorized by § 707(b)(2)(B), to rebut that presumption by showing "special circumstances."

Similarly, Congress rationally could have decided that the chapter 13 plans of above-median income debtors present the greatest potential for abuse, and could have decided to employ largely objective

expense criteria for computing such a debtor's projected disposable income that must be devoted to the plan. One of the difficulties in applying the disposable income test has always been the task of determining whether a particular expense is a reasonable one. Congress rationally could have opted to employ the more mechanical approach of § 1325(b)(3) (*i.e.,* use of the chapter 7 means test expense figures) for such debtors to bring to bear a degree of objectivity in fixing reasonable expenses.

The use of fixed amounts under the National and Local Standards relieves the court of the obligation to make largely subjective judgments regarding what is a reasonable expense. When an above-median income debtor employs the National Standards and Local Standards in computing certain expenses for disposable income purposes, that results in an aggregate amount of expenses under those Standards that are deemed not to be excessive in comparison to the expenses of other similarly situated individuals. For example, if a debtor elects to spend a modest amount on housing (compared to the typical debtor) and to devote the excess over the applicable housing expense under the Local Standards to vacations, that does not offend the means test: as long as the aggregate of his expenses are determined utilizing § 707(b)(2), then, in terms of aggregate expenditures allowed by § 707(b)(2), he is not living better than the average similarly situated debtor. When an above-median income debtor's plan proposes to pay a disposable income computed based on § 707(b)(2), he is paying the amount that ought to be expected to be paid by a debtor who fits within the same categories under the National and Local Standards.

■ Nevertheless, this approach will produce some odd results. A debtor having income just under the median income and having expenses identical to those of a debtor who has income just over the median income may be required to pay more under a plan than the above-median income debtor. This could occur because the below-median income debtor is limited to his actual housing expense in computing disposable income whereas the above-median income debtor employs the housing expense under the Local Standards and is not limited to his actual housing expense.[7] However, Congress was free to limit § 1325(b)(3) to above-median income debtors, and inevitably such line drawing may result in a few peculiar results when different tests are employed for the two different categories of debtors. The existence of those peculiar results does not demonstrate an absurdity that warrants interpreting the statute differently than as it is written and most naturally interpreted.

In § 1325(b)(3), Congress created a mechanical, objective test for determining those expenses covered by the National and Local standards in computing disposable income. By reason of the requirement in § 1325(b)(3) that amounts reasonably necessary to be expended for purposes of disposable income "shall be determined in

---

7. Indeed, if an above-median income debtor's income were to dip after confirmation of a plan to a below-median income level, the trustee might argue that he is entitled to obtain a modification of the debtor's plan under 11 U.S.C. § 1329(a), limiting him under the modified plan to his actual housing expense in computing disposable income, and thereby requiring him to pay more each month than he was required to pay under his original plan when he was in above-median income territory. However, the debtor could argue that he is entitled to a tradeoff: by reason of falling into below-median income territory, the "applicable commitment period" under the modified plan ought to be for three years instead of the five years that was required to confirm the original plan. 11 U.S.C. § 1325(b)(4).

accordance with subparagraphs (A) and (B) of section 707(b)(2)," the debtor is free to show "special circumstances" as described in § 707(b)(2)(B) that "justify additional expenses or adjustments of current monthly income for which there is no reasonable alternative" such as "a serious medical condition or a call or order to active duty in the Armed Forces." Congress did not see fit to permit the trustee or creditors to demonstrate that the expenses for those categories of expenses covered by the National and Local Standards should be adjusted downward in computing disposable income based on the special circumstance that the debtor's actual expenses were less than set forth by those standards. Congress could readily have permitted such an adjustment in computing disposable income, but it did not. Nevertheless, as discussed in part IV, *infra*, an above-median income debtor's plan that proposes to pay the debtor's disposable income employing the National and Local Standards in computing expenses in accordance with § 1325(b)(3) might still be objectionable in extraordinary circumstances under § 1325(a)(3) on the basis of a lack of good faith.

■ I recognize the intuitive logic of applying the values set forth in the Local Standards in a manner consistent with the Financial Analysis Handbook; indeed, I have twice ruled from the bench that those standards should apply in determining a debtor's monthly expenses for purposes of § 1325(b). But after re-examining the assumptions underlying this logic, the legislative history of the provision at issue,[8] and, most importantly, the language of the provision itself, I am convinced that under the means test of § 707(b)(2), and the disposable income test of § 1325(b)(3), which incorporates the expense side of the chapter 7 means test, Congress intended for debtors to use the values set forth in the Local Standards in calculating their monthly housing and utility expenses without considering how those values are used by IRS agents pursuing delinquent taxpayers. Consequently, the debtor's claimed housing expense of $1,012 does not violate § 1325(b)(3), and the chapter 13 trustee's objection on this point must be overruled.

## III

## STATUTORY CONSTRUCTION OF THE TERM "PROJECTED DISPOSABLE INCOME" IN 11 U.S.C. § 1325(b)

■ My interpretation of § 707(b)(2)(A)(ii)(I) confirms that the debt-

8. One of the co-sponsors of BAPCPA, Senator Charles "Chuck" Grassley of Iowa, opined in a floor statement issued *after* the enactment of BAPCPA that it was not "the intent of the law" for "consumers to claim deductions for expenses a debtor may not even have." Floor Statement of United States Senator Chuck Grassley, December 6, 2006, *available at* http://grassley.senate.gov/index.cfm?Fuse Action=PressReleases.Detail & PressRelease_id=5227&Month=12&Year=2006 (last visited Aug. 30, 2007). The court respects Senator Grassley's views on this subject, but his post-enactment articulation of his personal understanding of the statute's purpose cannot control. When Congress enacted BAPCPA, its intent was evidenced by the legislative history and statutory language with which this court has wrestled, and utilizing those materials, I have done the best I can to ascertain Congress's intent. Congress, as a whole, has the ability to amend a statute's language if it has led to a result that Congress deems unwise, but individual members of Congress cannot change the meaning of that language via post-enactment comments.

This is not say that Senator Grassley's concerns are off the mark. There is at least a valid question as to whether a debtor who calculates his disposable income using expenses that he does not actually have is abusing the chapter 13 process. I address this issue in my discussion of the good faith requirement of 11 U.S.C. § 1325(a)(3) below. *See* part IV, *infra*.

or's calculation of "disposable income" on her Official Form 22C complies with the definition of "disposable income" in § 1325(b)(2). But § 1325 does not require a debtor to funnel his disposable income to unsecured creditors; rather, it requires him to commit all of his *"projected* disposable income to be received in the applicable commitment period...." 11 U.S.C. § 1325(b)(1)(B) (emphasis added).

The modifier "projected" is defined by the Oxford English Dictionary as meaning "[p]redicted; calculated or forecast on the basis of current trends or data." *Oxford English Dictionary* vol. XII at 599 (2d ed.1989). The question is whether Congress intended for courts to use the "current ... data" provided by Official Form 22C as a basis for "calculat[ing]" amounts to be paid to unsecured creditors (by simply multiplying the current monthly income times the number of months in the "applicable commitment period") or, instead, for "forecast[ing]" such amounts (by using the current monthly income as a starting point for determining the amount of funding required).

Not surprisingly, courts have split over this issue, albeit in a lopsided fashion. Most courts have followed Judge Thurman's decision in *In re Jass,* 340 B.R. 411 (Bankr.D.Utah 2006), and Judge Nelms's decision in *In re Hardacre,* 338 B.R. 718 (Bankr.N.D.Tex.2006), in concluding that "[§ ] 1325(b)(1)(B)'s requirement that a plan propose to pay 'projected disposable income' means that the number resulting from Form 22C is a starting point for the [c]ourt's inquiry only." *In re Jass,* 340 B.R. at 415; *see also In re Hardacre,* 338 B.R. at 722 ("The court believes that the term 'projected disposable income' must be based upon the debtor's anticipated income during the term of the plan, not merely an average of her pre[-]petition income.").[9] A smaller number of courts agree with Judge Leonard's conclusion in *In re Alexander,* 344 B.R. 742 (Bankr.E.D.N.C.2006), that "to arrive at 'projected disposable income,' one simply takes the calculation mandated by § 1325(b)(2) and does the math." *Id.* at 749.[10]

**9.** *Accord Kibbe v. Sumski (In re Kibbe),* 361 B.R. 302, 307–15 (1st Cir. BAP 2007); *In re Upton,* 363 B.R. 528, 532–34 (Bankr.S.D.Ohio 2007); *In re Edmondson,* 363 B.R. 212, 214–18 (Bankr.D.N.M.2007); *In re Carlton,* 362 B.R. 402, 405–06 (Bankr.C.D.Ill.2007); *In re Riggs,* 359 B.R. 649, 650–53 (Bankr.E.D.Ky. 2007); *In re LaPlana,* 363 B.R. 259, 264–66 (Bankr.M.D.Fla.2007); *In re Slusher,* 359 B.R. at 294–300; *In re Devilliers,* 358 B.R. at 856–59; *In re Ward,* 359 B.R. 741, 744 (Bankr.W.D.Mo.2007); *In re Pak,* 357 B.R. 549, 551–53 (Bankr.N.D.Cal.2006); *In re Casey,* 356 B.R. 519, 522–24 (Bankr.E.D.Wash. 2006); *In re Thicklin,* 355 B.R. 856, 858–59 (Bankr.M.D.Ala.2006); *In re Sparks,* 360 B.R. 224, 228 n. 11 (Bankr.E.D.Tex.2006); *In re Balcerowski,* 353 B.R. 581, 589–90 (Bankr. E.D.Wis.2006); *In re LaSota,* 351 B.R. 56, 58–63 (Bankr.W.D.N.Y.2006); *In re Edmunds,* 350 B.R. 636, 645–47 (Bankr.D.S.C.2006); *In re Wayman,* 351 B.R. 808, 811 n. 7 (Bankr. E.D.Tex.2006); *In re Demonica,* 345 B.R. at 899–900; *In re McPherson,* 350 B.R. 38, 42–48 (Bankr.W.D.Va.2006); *In re Risher,* 344 B.R. 833, 834–37 (Bankr.W.D.Ky.2006); *In re Dew,* 344 B.R. 655, 659–61 (Bankr.N.D.Ala. 2006); *In re Grady,* 343 B.R. 747, 750–52 (Bankr.N.D.Ga.2006); *In re Fuller,* 346 B.R. 472, 475–83 (Bankr.S.D.Ill.2006); *In re McGuire,* 342 B.R. at 613–14; *In re Renicker,* 342 B.R. 304, 307–09 (Bankr.W.D.Mo.2006); *In re Mullen,* 369 B.R. 25, 31–35 (Bankr.D.Or. 2007); *In re Watson,* 366 B.R. at 528–32; *In re Nowlin,* 366 B.R. 670, 673–75 (Bankr. S.D.Tex.2007); *In re Grant,* 364 B.R. 656, 663–67 (Bankr.E.D.Tenn.2007); *In re Zimmerman,* No. 06–31086, 2007 WL 295452, at *2–8 (Bankr.N.D.Ohio Jan.29, 2007); *In re Foster,* No. 05–50448 HCD, 2006 WL 2621080, at *3–8 (Bankr.N.D.Ind. Sept.11, 2006).

**10.** *Accord In re Brady,* 361 B.R. 765, 768–75 (Bankr.D.N.J.2007); *In re Miller,* 361 B.R. 224, 228–35 (Bankr.N.D.Ala.2007); *In re Hanks,* 362 B.R. 494, 496–501 (Bankr.D.Utah 2007); *In re Tuss,* 360 B.R. 684, 690–96 (Bankr.D.Mont.2007); *In re Girodes,* 350 B.R.

*Alexander* and its progeny reason that the textual changes made to § 1325(b)(2) by BAPCPA dictate their reading of § 1325(b)(1). There is some merit to this position. Section 1325(b)(2) defines "disposable income" as "current monthly income received by the debtor (other than child support payments, foster care payments, or disability payments for a dependent child in accordance with applicable nonbankruptcy law to the extent reasonably necessary to be expended for such child)" less reasonably necessary expenses. 11 U.S.C. § 1325(b)(2). "[C]urrent monthly income," as defined by the Bankruptcy Code,

(A) means the average monthly income from all sources that the debtor receives (or in a joint case the debtor and the debtor's spouse receive) without regard to whether such income is taxable income, derived during the 6–month period ending on—

(I) the last day of the calendar month immediately preceding the date of the commencement of the case if the debtor files the schedule of current income required by section 521(a)(1)(B)(ii); or (ii) the date on which the current income is determined by the court for purposes of this title if the debtor does not file the schedule of current income required by section 521(a)(1)(B)(1); and

(B) includes any amount paid by any entity other than the debtor (or in a joint case the debtor and the debtor's spouse) on a regular basis for the household expenses of the debtor or the debtor's dependents (and in a joint case the debtor's spouse if not otherwise a dependent), but excludes benefits received under the Social Security Act, payments to victims of war crimes or crimes against humanity on account of their status as victims of such crimes, and payments to victims of international terrorism (as defined in section 2331 of title 18) or domestic terrorism (as defined in section 2331 of title 18) on account of their status as victims of such terrorism.

11 U.S.C. § 101(10A).

Should a court interpret "projected" to mean that it should *compute* "disposable income" as thus defined or, instead, as meaning that the court should *forecast* that "disposable income?" Strictly speaking, it would be absurd to attempt to forecast the debtor's "average monthly income ... derived during the 6–month period ending on ... the last day of the calendar month *immediately preceding the date of the commencement of the case*" unless one anticipated the filing of a new bankruptcy petition at some point in the future. But the alternative is no less confounding, for if, as the *Alexander* court suggests, the modifier "projected" means only that the debtor must multiply his "current monthly income" figure from Official Form 22C less the expenses calculated on that same form (for above-median income debtors) or on Schedule J (for below-median income debtors) by the number of months in the applicable commitment period, then the only way to give any meaning to the phrase "*to be received* in the applicable commitment period" would be to conclude that a debtor must commit only that portion of the product of his calculation that is "to be received" by the debtor; *i.e.,* the *lesser* of his Official Form 22C figure and his actual

31, 36–38 (Bankr.M.D.N.C.2006); *In re Rotunda,* 349 B.R. 324, 326–33 (Bankr.N.D.N.Y. 2006); *In re Farrar–Johnson,* 353 B.R. at 227–30; *In re Barr,* 341 B.R. 181, 183–86 (Bankr. M.D.N.C.2006); *In re McGillis,* 370 B.R. at 724–27; *In re Winokur,* 364 B.R. 204, 205–06 (Bankr.E.D.Va.2007).

anticipated monthly income.[11] Such an interpretation would make a mockery of § 1325(b)(1).

One way or the other, a court must do violence to the "plain meaning" of § 1325(b)(1) to effectuate Congress's intent in amending it. In deciding which way to proceed, a court is guided by the prior practice of courts in interpreting § 1325(b)(1) and the legislative history of the statute. Both of these factors weigh heavily in favor of the *Jass* and *Hardacre* approach.

Before BAPCPA became effective in 2005, there was no question that the phrase "projected disposable income" referred to income that was predicted for the future, not calculated from the past.[12] Courts used a debtor's schedules as a "starting point" for predicting the debtor's future income as a matter of practice, but the figure arising from those schedules was not determinative. *In re Jass*, 340 B.R. at 417. Not only could a party-in-interest successfully object to the debtor's plan under § 1325(b)(1) if the income listed by the debtor was inaccurate or the expenses unreasonable (*i.e.*, if the debtor's

calculation of "disposable income" for purposes of § 1325(b)*(2)* was flawed), it could also object if there was a change in the debtor's circumstances such that the debtor's anticipated income differed from his current income.[13] No court worth its salt would "simply take[ ] the calculation mandated by § 1325(b)(2) and do[ ] the math." *In re Alexander*, 344 B.R. at 749.

Given the prior practice of courts in interpreting the phrase "projected disposable income," one would have expected Congress to have altered the phrase, provided a different definition for the old modifier, or at least made clear in the legislative history of its other amendments to § 1325(b)(1) that this practice was incorrect. Congress did none of these things. The only changes that it made to § 1325(b)(1) were to substitute the phrase "applicable commitment period" for "three-year period" and specify that projected disposable income be used to pay "unsecured creditors" instead of creditors in general. It provided no definition for the modifier "projected." And the House Report for BAPCPA says nothing whatsoever about the meaning of the modifier

---

11. Alternatively, an interpretation that straddles the two different meanings of "projected" is to read the statute as requiring debtors to commit the average of their income that is received in *both* (1) the six months prior to the commencement of the case *and* (2) the "applicable commitment period;" *i.e.*, the three or five years following confirmation of the debtor's plan. This alchemistic construction strikes me as implausible.

12. As Judge Markell notes in *Slusher*, "the term 'projected disposable income' as used in [§ ] 1325(b)(1)(B) does not exist in isolation in the Bankruptcy Code," but rather "appears in five other places in the Code, none of which define it, and only one of which refers back to the definition of 'disposable income' provided in [§ ] 1325(b)(2)." *In re Slusher*, 359 B.R. at 297. "Congress' choice to use both 'projected disposable income' and 'disposable income' in the Code indicates an in-

tent to apply different meanings to the two terms." *Id.*

13. *See In re Kibbe*, 361 B.R. at 307 n. 5 ("While Schedule I was the main reference for determining a debtor's income, other evidence, such as the testimony of the debtor, was considered in the event that the court believed Schedule I to be an inaccurate predictor of future income."); *In re Pak*, 357 B.R. at 553 ("Commonly, pre-BAPCPA, chapter 13 debtors anticipated changes in their financial circumstances during the term of the plan and structured their proposed payments accordingly. Alternatively, when debtors' proposed payments did not reflect anticipated increases in income or diminished expenses during the term of the plan, the chapter 13 trustee or a creditor objected to the plan as not contributing all of the debtor's disposable income to the plan.").

"projected" or the phrase "projected disposable income" in § 1325(b)(1). H.R.Rep. No. 31, at 318.

■■■ "Congress acts intentionally and purposefully when it includes particular language in one section of a statute but omits it in another." *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 537, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994). Interpreting the term "projected" in the manner done by the *Alexander* court would effectively re-write § 1325(b)(1) without congressional approval.[14] Moreover, this *sub silentio* revision of § 1325(b)(1) conflicts with 11 U.S.C. § 1329, which permits debtors to modify their confirmed plans based on, *inter alia,* changes in financial circumstances.[15] As one court sagely noted, "[i]t makes little sense for Congress to include in the Bankruptcy Code the flexibility provided by §§ 1323 and 1329 permitting modification of a plan when a debtor's financial circumstances change ..., but not to provide for a realistic determination of the debtor's ability to make payments in the first place." *In re Zimmerman,* 2007 WL 295452, at *6.

The purpose underlying § 1325(b) further indicates that the interpretation of "projected disposable income" used by the *Jass* and *Hardacre* courts is correct. "The concept of projected disposable income was first introduced into the Bankruptcy Code with the 1984 amendments and 'was intended to be an economic test of the debtor's best efforts.'" *In re Carlton,* 362 B.R. at 405 (quoting 2 Keith M. Lundin, *Chapter 13 Bankruptcy* § 163.1 (3d ed.2000)). The inclusion of the test in § 1325 ended the "hotly contested issue" of whether a debtor needed to commit some minimal amount of funding to unsecured creditors in his plan of repayment to satisfy the "good faith" requirement of § 1325(a). *In re McGillis,* 370 B.R. at 740–41.[16] The test effectively imposed an unrebuttable presumption of "bad faith" on all plans that proposed to commit fewer funds toward the payment of unsecured creditors than the debtors proposing the plans could actually afford.[17] Calculating debtors' "projected disposable income" "by utilizing their *actual* disposable income,

**14.** *See In re McGuire,* 342 B.R. at 614 (interpreting the phrase "projected disposable income" by referencing pre-BAPCPA case law because "[t]he BAPCPA amendments do not appear to change that holding").

**15.** "Statutory construction ... is a holistic endeavor," *United Savings v. Timbers of Inwood Forest, Ltd.,* 484 U.S. 365, 371, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988), as the Supreme Court noted recently in interpreting certain language found in 11 U.S.C. § 706(a). *See Marrama v. Citizens Bank of Mass.,* —— U.S. ——, ——, 127 S.Ct. 1105, 1109, 166 L.Ed.2d 956 (2007) (construing provision that a "debtor may convert" his case to chapter 13 "at any time" by looking at the language "in connection with the other provisions of the Code, and the Bankruptcy Rules"). In this case, it is only "[b]y viewing the historical calculations of disposable income through the prism of current circumstance[ ] [that] the [c]ourt may both 'project' [a] debtor's future

disposable income and give effect to the entirety of the Code's provisions." *In re Devilliers,* 358 B.R. at 859.

**16.** *See also* Conrad K. Cyr, *The Chapter 13 "Good Faith" Tempest: An Analysis and Proposal for Change,* 55 Am. Bankr.L.J. 271, 272–73 (Summer 1981) ("The controversy concerning the chapter 13 'good faith' test has resulted in more litigation than any other issue to arise since the enactment of the Bankruptcy Code.").

**17.** I am not familiar with any authority casting § 1325(b) in those specific terms, but that has been the undeniable effect of the "projected disposable income" test. The amendments made by Congress to § 1325(b) in BAPCPA only strengthen my confidence in this formulation, as it linked § 1325(b) with § 707(b), which explicitly addresses the circumstances giving rise to a presumption of abuse in the filing of a case under chapter 7.

and not the pre-petition and backward looking disposable income calculation on [Official Form 22C], is in harmony with the requirement that [debtors] are to propose a plan in good faith under section 1325(a)(3)." *In re Grady*, 343 B.R. at 751 (emphasis in original).[18]

Nothing in the text or legislative history of BAPCPA suggests that Congress intended to abandon the principles that led to the creation of the projected disposable income test twenty-three years ago. To the contrary, Congress crafted the means test to "ensure that those who can afford to repay some portion of their unsecured debt [be] required to do so." 151 Cong. Rec. S2470 (March 10, 2005). "If the purpose of the disposable income calculations in the [c]hapter 13 context is to ferret out exactly how much money a debtor has available to pay creditors ... then looking only to the income the debtor made in the six months before he files does not further that objective." *In re Balcerowski*, 353 B.R. at 590.

Indeed, interpreting the phrase "projected disposable income" to refer to income predicted for the future actually leads to results more in tune with the "means test" set forth in § 707(b) than simply calculating a figure based solely on income received in the past. Section 707(b)(2)(B) provides that an above-median income debtor in chapter 7 may rebut the presumption of abuse arising from § 707(b)(2)(A) by demonstrating "special circumstances ... that justify additional

expenses or adjustments of current monthly income for which there is no reasonable alternative." 11 U.S.C. § 707(b)(2)(B)(I). Thus, a debtor who receives disposable income barely above the median for the area in which he lives but loses his job two weeks before he files for bankruptcy might be able to rebut the presumption of abuse arising by virtue of the means test by demonstrating that his job loss constitutes a "special circumstance[ ]."

Section 1325(b)(3), which governs the calculation of "[a]mounts reasonably necessary to be expended under [§ 1325(b)(2) ]," provides that such expenses "shall be determined in accordance with subparagraphs (A) *and (B)* of section 707(b)(2)," 11 U.S.C. § 1325(b)(3) (emphasis added). But this incorporation of the "special circumstances" exception only applies to the expense side of the "disposable income" equation. Nothing in § 1325(b)(2), or § 1325(b) in general, permits a court to consider "special circumstances" that would lead to "adjustments of current monthly income" as contemplated by § 707(b)(2)(B).

This discrepancy permits two possible inferences regarding for a debtor whose declining income is a "special circumstance" under § 707(b)(2)(B)(I). Either Congress intended to make it harder for such a debtor to submit a confirmable plan of repayment in chapter 13 than to qualify for chapter 7 relief, which makes no sense given Congress' expressed preference for

---

18. Even those courts following *Alexander* admit that the *Jass* and *Hardacre* approach does a much better job of effectuating the purpose behind the creation § 1325(b) in the first place. *See, e.g., In re Hanks*, 362 B.R. at 502 (expressing appreciation for "the logic and desire of returning to a chapter 13 practice that more closely resembles pre-BAPCPA practice"); *In re Rotunda*, 349 B.R. at 331 ("It is understandable that courts would attempt to interpret the word 'projected' in

such a way that supports the overwhelming sense that debtors seeking a 'fresh start' must make every effort to pay their unsecured creditors as much as possible during the 'applicable commitment period.' "); *In re Alexander*, 344 B.R. at 750 ("To veterans of [c]hapter 13 practice, it runs afoul of basic principles to suggest that a debtor with no disposable income can nonetheless propose a confirmable plan.").

the maximal repayment of debt, or Congress recognized that the projection of the debtor's income for purposes of § 1325(b)(1) would already take into account "special circumstances" warranting "adjustments of current monthly income" because the projection would be a forecast of the debtor's future income, not a calculation based on his past income.[19]

For all of these reasons, I agree with the *Jass* and *Hardacre* line of cases that the phrase "projected disposable income" in § 1325(b)(1) refers to income that it is reasonable to project that the debtor will receive. I do not mean to suggest, however, that a debtor (or other party-in-interest) can simply substitute the figures set forth in the debtor's schedules for those found in Official Form 22C in determining projected disposable income. Neither Schedule I, which is used to compute a debtor's monthly income, nor Schedule J, which does the same with respect to monthly expenses, use the same methodology as that set forth in §§ 1325(b)(2) and 1325(b)(3) (at least, not for above-median income debtors).[20] Consequently, Schedule I is only marginally relevant in determining a debtor's projected disposable income for purposes of a debtor's chapter 13 plan.[21] Schedule J is similarly unhelpful

19. In the case of expenses, but not in the case of income, it was necessary for § 1325(b)(3) to incorporate § 707(b)(2)(B) in the calculation of disposable income for an above-income median income debtor. This follows from the meanings ascribed to the terms "current monthly income" and "amounts reasonably necessary to be expended" in § 1325(b)(2) and (3).

A debtor's current monthly income is based on the debtor's actual income (less certain excluded types of income) over a six-month period. Consequently, the only "special circumstances" that could lead to "adjustments of current monthly income" would be those circumstances rendering the debtor's actual current income at variance from the six-month average of the debtor's income. These circumstances would be included in any forecast of the debtor's monthly income, eliminating the need for any reference to § 707(b)(2)(B) in § 1325(b)(2).

In contrast, the debtor's calculation of monthly expenses is not a tally of the debtor's actual expenses, nor does it reflect the expenditures made by the debtor in the past. Rather, expenses are calculated in large part based on the figures set forth in the IRS's Local and National Standards "as in effect on the date of the order for relief." 11 U.S.C. § 707(b)(2)(A)(ii)(I). The only "special circumstances" that could "justify additional expenses" would be circumstances not contemplated by § 707(b)(2)(A), which would *not* be included in a forecast of the debtor's monthly expenses if the debtor were limited to the expenses specified by § 707(b)(2)(A). It was therefore necessary for Congress to reference § 707(b)(2)(B) in § 1325(b)(3) (specifying what are reasonable expenses), but not in § 1325(b)(2).

20. "The income required to be reported on Schedule I is different from 'current monthly income' as defined in 11 U.S.C. § 101(10A)." *In re Pak*, 357 B.R. at 552. For example, the definition of "current monthly income" provided in § 101(10A) of the Bankruptcy Code excludes social security benefits, whereas Schedule I does not. Because this methodology must be used in calculating "disposable income" for both the past (for purposes of the means test imposed by § 707(b)) *and* the future (for purposes of § 1325(b)(2)), "it is not appropriate to disregard [the current monthly income figure listed in Official Form 22C] 'where the additional income offered to rebut [that figure's] accuracy is derived from a source that 11 U.S.C. § 101(10A)(B) specifically excludes from the calculation of [current monthly income].'" *In re Ward*, 359 B.R. at 745 (quoting *In re Schanuth*, 342 B.R. 601, 606 n. 12 (Bankr.W.D.Mo.2006)). Instead, "a court should attempt to predict what the debtor's disposable income during the term of the plan will be, using the definition of 'current monthly income' set forth in 11 U.S.C. § 101(10A)." *In re Pak*, 357 B.R. at 552.

21. Schedule I can still serve as a starting point for determining a debtor's projected monthly income, but it will not always be dispositive, for the debtor's projected monthly income "shall not include types of income excluded from 'current monthly income' by

where above-median income debtors are concerned. *See In re Edmondson*, 363 B.R. at 218–19 (holding that "Schedule J is irrelevant" in computing projected disposable income for above-median income debtors).

Instead, "courts must consider changes in circumstances, both increases and decreases to income and expenses, to a debtor's financial situation, *being always guided by the allowed methodology set forth in the means test.*" *In re LaPlana*, 363 B.R. at 266 (emphasis added).[22] Where an above-median income debtor is concerned, the debtor (or other party-in-interest) must demonstrate either a change or reasonably anticipated change in the debtor's income using the methodology set forth in § 1325(b)(2) or a change in the circumstances giving rise to the applicable expense figures dictated by the Local and National Standards (or a change in actual expenses for those types of expenses fall-

ing under the Other Applicable Expenses category in the Financial Analysis Handbook) if he wishes to prove that his future income is any different from his current income.[23] In the absence of such evidence, the disposable income figure listed on the debtor's Official Form 22C will serve as the only evidence of the debtor's disposable income and will therefore dictate the amount of funds to be committed to unsecured creditors under the debtor's plan of repayment. Official Form 22C will, in other words, have precisely the same function as the debtor's schedules had pre-BAPCPA: the evidentiary source for a presumption of disposable income that can be rebutted through the submission of extrinsic evidence. *See In re Slusher*, 359 B.R. at 299 ("The historical nature of 'dispositive income' is a presumptive guide to the prospective 'projected disposable income,' but only a guide.").[24]

section 101(10A) (Social Security Act benefits and payments to victims of war crimes, crimes against humanity, and terrorism) and section 1325(b)(2) (child support payments, foster care payments, and certain disability payments for a dependent child)." *In re Teixeira*, 358 B.R. 484, 487 n. 4 (Bankr.D.N.H. 2006). In this respect, I respectfully disagree with the *Jass* court and those courts that have followed it in allowing or in some instances compelling debtors to substitute the monthly income figure listed on Schedule I to determine the debtors' "projected disposable income." *See In re Jass*, 340 B.R. at 418–19; *accord In re Upton*, 363 B.R. at 532–35; *In re Carlton*, 362 B.R. at 406–07; *In re Mullen*, 369 B.R. at 33–35; *In re Watson*, 366 B.R. at 531–32. Courts engaging in this practice effectively reject the manner in which "disposable income" is supposed to be determined under § 1325(b)(2), in so doing giving credence to the concern expressed in *Alexander* that "[i]f 'disposable income' is not linked to 'projected disposable income[,]' then it is just a floating definition with no apparent purpose." *In re Alexander*, 344 B.R. at 749.

**22.** Obviously, I cannot follow the methodology of § 101(10A) insofar as that provision

mandates the calculation of an average figure based on pre-petition data; it is in this respect that the phrase "projected disposable income" differs from "disposable income." But the criteria used to determine that portion of the debtor's gross income subject to the disposable income requirement retains its full force. *See* n. 20, *supra*.

**23.** *See In re Fuller*, 346 B.R. at 484 ("Unless, then, the IRS standards change, or unless the debtor's state of residence ... or household size change, an above-median income debtor's expenses are going to be exactly the same for every one of the six months leading up to the filing of the bankruptcy. Absent those two changes in condition ... in the future, the above-median income debtor[']s *prospective* expenses will be exactly the same as her historical expenses." (Emphasis in original)).

**24.** My adherence to the methodology set forth in §§ 1325(b)(2) and 1325(b)(3) renders moot the argument made by some critics of the *Jass* and *Hardacre* approach that "[o]ne of the aims of the means test was to limit judicial involvement—and so judicial discretion-by making mechanical the determination of

In this case, the chapter 13 trustee objects to the debtor's plan only on the grounds that her "actual" housing expense; *i.e.,* the expense listed on the debtor's Schedule J, is less than the expense provided by the Local Standards for a person in the debtor's situation. I have already determined that the amount listed in the Local Standards, not the amount listed in the debtor's schedules, controls its calculation of the debtor's housing expense for purposes of § 1325(b). The trustee has presented no evidence that the circumstances giving rise to the claimed expense amount of $1,012 have changed; therefore, the presumption that this same expense will be incurred by the debtor in the future and that her disposable income will remain the same as a consequence is unrebutted.

## IV

### GOOD FAITH REQUIREMENT OF 11 U.S.C. § 1325(a)

In addition to satisfying the projected disposable income requirement of § 1325(b), a debtor must demonstrate that his plan of repayment is filed "in good faith" pursuant to § 1325(a)(3). A debtor need not commit a specific amount of funding or pay a minimum percentage of his unsecured debt to propose a plan in good faith. *Barnes v. Whelan (In re Barnes),* 689 F.2d 193, 198 (D.C.Cir.1982) ("We conclude section 1325(a)(3) does not require any particular level of minimum repayment as a prerequisite to [c]hapter 13 plan confirmation."). Instead, the requirement concerns the "honesty of [the debtor's] intention." *Id.* at 200.

The means test now incorporated into the "projected disposable income" requirement accomplishes Congress' goal of removing discretion from the judiciary, thereby preventing wayward judges from abusing their discretion by crediting debtors for unreasonable expenses. Unfortunately, it also introduces a new means for abuse of the system, as opportunistic debtors may be able to claim expenses under the Local or National Standards that they do not actually have.[25] In those extreme

abuse under section 707(b)," and that "[t]he means test in section 1325(b)(3) is meant to have the same mechanical effect." *In re Farrar–Johnson,* 353 B.R. at 229. The discretion once exercised by courts in applying § 1325(b)(1) related entirely to the methodology used by courts to determine the total amount of income available for commitment to the chapter 13 plan and the reasonableness of the debtor's expenses. That discretion is extinguished by faithful application of the methodologies set forth in §§ 1325(b)(2) and 1325(b)(3). No such discretion is exercised when, as contemplated by the term "projected disposable income," the court permits parties in interest to show that the circumstances relevant to those methodologies—the variables to be placed in the fixed equations of §§ 1325(b)(2) and 1325(b)(3), so to speak—have changed or are likely to change since the time frame addressed by the completed Official Form 22C.

25. The potential for abuse of the chapter 13 process exists regardless of whether one favors the interpretation of § 707(b)(2)(A)(ii)(I) advanced by Judge Markell in *Slusher* over that advanced by this court because the expenses covered by the National Standards in the Financial Analysis Handbook, unlike those covered by the Local Standards, are to be applied regardless of the debtor's actual expenses even under the IRS's internal procedures. *See* Wedoff, 79 Am. Bankr.L.J. at 255 ("The IRM makes it clear that the total applicable expense allowance of the National Standards is to be given to each taxpayer, regardless of the taxpayer's actual expenditures in any of the National Standards categories or the taxpayer's total expenditures in the combined categories.") (citing IRM § 5.15.1.8 ¶ 2). This is yet another reason to disregard Senator Grassley's floor statement from December of 2006, for it is clear that in the case of the National Standards, Congress did not intend that lower actual expenses be employed, as even the IRS does not substitute lower actual expenses for the National Standards expenses.

circumstances where the debtor's manipulation of the means test amounts to an abuse of the chapter 13 process, the court must deny confirmation of the debtor's plan even if the requirements of § 1325(b) are met, for "[§ ] 1325(b) is a hazard, not a harbor." *In re McGillis,* 370 B.R. at 749–51.

That this is the proper interpretation of § 1325(b) is supported by the analogous treatment of bad faith in the case of a debtor whose case does not run afoul of the means test's presumption of abuse under § 707(b)(2). The § 1325(b)(3) calculation of disposable income is but a mechanical test for determining that the debtor is proceeding reasonably, but it does not purport to cover all instances of bad faith that may arise from the debtor's actual financial circumstances. It is similar to the means test of § 707(b)(2), employed to determine whether a debtor's utilization of chapter 7 is presumptively abusive. Even if, after a chapter 7 debtor makes the calculations required by the means test of § 707(b)(2), the presumption of abuse under § 707(b)(2)(A)(I) does not arise or is rebutted, the court is instructed that when it determines whether a case should be dismissed as an abuse of chapter 7, the court must consider:

> (A) whether the debtor filed the petition in bad faith; or
>
> (B) the totality of the circumstances ... of the debtor's financial situation demonstrates abuse.

11 U.S.C. § 707(b)(3).

Courts have interpreted § 707(b)(3) as permitting a court to consider a debtor's actual ability to pay debts in ruling on a § 707(b)(1) motion to dismiss based on abuse even if the presumption of abuse under the means test of § 707(b)(2) has not arisen in the case or has been rebutted. *See In re McGillis,* 370 B.R. at 744–47 ("ability to pay is a factor in the totality of circumstance test"); *In re Pfeifer,* 365 B.R. 187, 192–93 (Bankr.D.Mont.2007) ("a debtor's ability to pay is still an important factor under § 707(b)(3), notwithstanding the means test of § 707(b)(2)"); *In re Henebury,* 361 B.R. 595, 606–07 (Bankr. S.D.Fla.2007) ("Either ability to pay *or* bad conduct in connection with the bankruptcy will warrant dismissal for abuse under § 707(b)(3)". (Emphasis in original.)). *But see In re Nockerts,* 357 B.R. 497, 505–08 (Bankr.E.D.Wis.2006) ("while ability to pay is a factor in the totality of circumstances test, ... if it is the only indicia of abuse, the case should not be dismissed under that test"). When such a debtor converts his case to chapter 13 to avoid dismissal under § 707(b)(1), it stands to reason that the debtor ought not to be able to utilize § 1325(b)(3) (and the expenses provided by the same means test of § 707(b)(2)) as a safe harbor preventing scrutiny of his actual expenses in assessing his actual ability to pay creditors in determining whether bad faith is present. *In re McGillis,* 370 B.R. at 746–47.

■ A handful of courts interpreting § 1325(a)(3) after the enactment of BAPCPA have concluded that a debtor need not commit any more funds to pay unsecured creditors than those required by § 1325(b)(1) for the plan to be filed in good faith.[26] I agree with this result as a gener-

---

**26.** *See In re Farrar–Johnson,* 353 B.R. at 231–32 ("The disposable income a debtor decides to commit to his plan is not the measure of his good faith in proposing the plan."); *In re Alexander,* 344 B.R. at 752 ("So long as the debtor calculates the projected disposable income with specific reference to the new defi-

nition of disposable income and commits that projected disposable income to pay unsecured creditors for the applicable commitment period, she is in good faith compliance with the Code."); *In re Barr,* 341 B.R. at 186 ("the debtor's ability to pay and whether the proposed plan commits all of the debtor's dispos-

al matter. Nevertheless, there may be times when a debtor commits so little income to creditors, relative to his true ability (for example, as a result of a windfall) to make payment to them based on his actual expenses, that his proffered plan suggests a subjective intent not to make a good faith effort at repayment at all.

Consider a hypothetical above-median income debtor who inherited his expensive home mortgage-free, and whose actual housing expense is thus zero, but who, under the Local Standards, would be entitled to a mortgage/rent expense of $1,012 for purposes of § 1325(b)(3), which, with his other expenses under § 727(b)(2), results in a disposable income under § 1325(b)(3) of only $100 per month. The hypothetical debtor intends to pocket a difference of $1,012 between his actual expenses and the expenses allowed under § 1325(b)(3), and intends to utilize that

difference to fund expenditures on lavish dining out each month, while only paying $10 per month under the plan. Such intentions would bespeak a lack of an honest intention to attempt to repay his creditors; i.e., bad faith under § 1325(a)(3), even if his plan passes muster under § 1325(b)(3).[27] Utilizing bankruptcy as a refuge from creditors' collection demands with an intention to continue a lavish lifestyle without any sincere attempt to repay creditors falls into that category of extreme circumstances that justify a finding of bad faith.

 Only those debtors engaging in subterfuge so blatant as to indicate that they have "unfairly manipulated the Bankruptcy Code, or otherwise proposed [their] [c]hapter 13 plan in an inequitable manner," In re Goeb, 675 F.2d 1386, 1390 (9th Cir.1982), will run afoul of § 1325(a)(3).[28]

able income must be determined under section 1325(b) rather than as an element of good faith under section 1325(a)(3))"; In re Winokur, 364 B.R. at 206 ("If the sole objection to the debtor's good faith is that the debtor proposes to pay the amount Congress requires by the mathematical formula, the debtor has complied with the good faith requirement."); but see In re Devilliers, 358 B.R. at 867–68 ("strict and technical compliance with the means test does not necessarily satisfy any debtor['s] burden of good faith"); In re Edmunds, 350 B.R. at 647–49 ("Nothing in the legislative history of [BAPCPA] clearly indicates that Congress intended to change the existing practice in this Circuit of considering a debtor's actual financial situation at the time of filing or the percentage of proposed repayment as elements of good faith."); In re McGillis, 370 B.R. at 740–53 ("a debtor's ability to fund a[c]hapter 13 plan based upon his current earnings and expenses remains an important consideration for purposes of determining whether the debtor's plan is proposed in good faith under [§ ] 1325(a)(3) even in those instances when the debtor has successfully withstood an objection brought under [§ ] 1325(b)").

27. On the other hand, a debtor who elects to live in modest housing (relative to the typical

debtor of similar means) ought not be punished for how he elects to devote his resources. See In re McGillis, 370 B.R. at 751–52 ("I see no reason why a debtor could not choose a lifestyle more frugal than the one dictated by a 'good faith' budget and pocket those savings without running afoul of [§ ] 1325(a)(3)."). Only a debtor filing a plan that is so manifestly unfair to unsecured creditors as to indicate a subjective intent by the debtor not to sincerely and honestly attempt to repay his debts would be rejected on grounds of bad faith.

28. Both Goeb and Barnes hold that there is no minimal payment requirement implicit in § 1325(a)(3), and, while the Barnes court did not expressly adopt language in Goeb indicating that a debtor's intention not "to substantially repay unsecured creditors" is a "relevant" consideration in determining the debtors' good faith in that case, In re Goeb, 675 F.2d at 1391, the cases should be read together in determining the scope of the Barnes court's ruling. Barnes addressed one narrow situation (the failure of a debtor to propose a plan making a "meaningful payment" to unsecured creditors), and expressly declined to provide "a comprehensive definition of 'good faith' " in resolving that issue.

As a practical matter, the good faith test may seldom produce litigation. It would require the party objecting to confirmation to examine the debtor's schedules to determine if there is a serious discrepancy between the debtor's actual monthly disposable income and the disposable income to be committed to unsecured creditors pursuant to § 1325(b), and then, if such a discrepancy exists, to investigate the circumstances giving rise to that discrepancy to ascertain any evidence of subjective bad faith. Bad faith is not demonstrated by showing that the debtor elected to spend less on one class of expenses (in an amount less than the expenses allowed by § 1325(b)(3)) and more on another class of expenses (in excess of the expenses allowed by § 1325(b)(3)), and arguing, without more, that the debtor's actual expenditure on the

first class demonstrates that he has a greater ability to pay than is indicated by § 1325(b)(3).[29]

■ In this case, the debtor has filed a plan of repayment that commits virtually the same amount of funds to unsecured creditors ($260 per month) as the amount of monthly disposable income that the debtor actually receives ($264). There is no basis for concluding that the debtor's plan is filed in bad faith. The chapter 13 trustee's objection to confirmation will be overruled and the debtor's first amended plan confirmed.

## V

## CONCLUSION

I freely admit that my decision today may not withstand the test of time. It

---

689 F.2d at 200. Moreover, the debtors in *Barnes* both devoted their actual disposable incomes to their respective plans, and the D.C. Circuit quoted with approval the district court's conclusion that Barnes's plan "offered repayment to the maximum extent she honestly believed she was capable (and therefore) met chapter 13's good faith requirement." *In re Barnes*, 13 B.R. 997, 1000 (D.D.C.1981) (quoted in *In re Barnes*, 689 F.2d at 197). This suggests that the *Barnes* court would find a debtor's intent to pay *actual* disposable income a relevant inquiry if it were interpreting § 1325(a)(3) today, just as the Ninth Circuit considered a debtor's intent to repay his unsecured creditors a relevant consideration in *Goeb*. (Indeed, the *Barnes* court itself considered whether the debtor had engaged in any behavior "within the ambit of bad faith as traditionally interpreted" *in addition to* whether the debtors involved in that case "engaged in any specific misconduct" or "proposed the plan for an improper purpose." 689 F.2d at 200.) In any event, nothing in my ruling today offends the holding in *Barnes*, which addressed whether a plan that failed to provide a meaningful amount of payment to unsecured creditors was made in good faith, because this court's analysis concerns only the subjective intent of the debtor.

**29.** *See* n. 27, *supra*. Illustratively, the trustee conceivably could argue in this case that the debtor's plan is filed in bad faith because the debtor could reduce those expenses that actually exceed the values set forth in the Local Standards and then apply the difference between her actual housing expense and the Local Standards expense towards her plan. But this takes things one step too far, for "to sit as a [c]hapter 13 [j]udge against the backdrop of the panoply of [ ] forces that shape debtors' choices does not permit the [j]udge to substitute his or her value judgments for those of the debtor." *In re LaSota*, 351 B.R. at 61. "All that [§ ] 1325(a)(3) requires is that the debtor justify that what he has proposed to keep for himself vis-à-vis what he proposes to pay his creditors under his plan is a fair allocation under the circumstances." *In re McGillis*, 370 B.R. at 749–51. Moreover, the question is not whether a debtor's proposed scheme of payments is fair to creditors in an objective sense, but whether the debtor *intends* to deal with his creditors in an equitable fashion. *See id.* at 748–49 (describing § 1325(a)(3) as "the subjective counterpart to [§ ] 1325(b)'s objective effort to assess" the "debtor's financial wherewithal"). A debtor does not need to rearrange his life in conformance with the Internal Revenue Manual to file a plan in good faith.

24

may well be the case that Congress really intended for debtors to always use the lesser of their actual expenses or the "applicable" IRS guidelines, but erred in its drafting of the statute; that it fully intended for the courts to plug in the average of a debtor's income from the six-month period preceding the filing of the debtor's petition no matter how much the debtor's circumstances may have changed, but failed to make that intention clear in the rewritten statute; or even that it intended to allow debtors to hoard as much money as the means test will permit so long as they commit their "projected disposable income" to debtors. Until these thorny issues are sorted out by the various courts of appeal or Congress, no bankruptcy court can say with certainty that it knows how the amended § 1325 should work. Today's decision is an educated guess, nothing more.

With that *caveat* in mind, I believe that my decision today is both faithful to the letter and spirit of BAPCPA and practicable for debtors and trustees alike. In the vast majority of cases, the figures derived from Official Form 22C will decide how much money is to be committed to unsecured creditors in the debtor's chapter 13 plan for above-median income debtors. Where use of the means test figures would not reflect the reality of the debtor's actual situation to the debtor's disadvantage, the debtor can produce evidence showing a change in income or "special circumstances" warranting an increase in permitted monthly expenses. Where use of the means test suggests that the debtor intends to manipulate the chapter 13 process in an unfair manner, the chapter 13 trustee and creditors can object under § 1325(a)(3). The statute can effectuate Congress' desire for uniformity and objectivity without producing absurd results.

As for the plan at issue in this case, I find that it satisfies the requirements of § 1325(b)(1) and that it is filed in good faith as required by § 1325(a)(3). The trustee's objection will be overruled and the debtor's plan confirmed in light of this decision.

An order follows.